Clay **COTTEN**, Receiver of **ICT** Insurance Company, Appellant,

v.

**REPUBLIC NATIONAL BANK OF DALLAS**, Appellee.

No. 16576.

Court of Civil Appeals of Texas.

Dallas.

Oct. 15, 1965.

Rehearing Denied Nov. 12, 1965.

John R. Grace, Austin; Keith, Mehaffy & Weber, Beaumont; W. E. Cureton, Richey, Sheehy, Teeling & Cureton, Waco, for appellant.

Arthur Blanchard, Henry D. Akin, Sr., and Neth L. Leachman, Dallas, for appellee.

DIXON, Chief Justice.

This is an appeal from a summary judgment in favor of Republic National Bank at Dallas, defendant in the trial court, in a suit by Clay Cotten, Receiver of ICT Insurance Company. Appellant will hereafter be referred to as the Receiver, appellee as the Bank and the insurance company as ICT.

This suit was filed in Travis County, Texas by C. H. Langdeau, then Receiver of ICT, on November 6, 1958 against approximately 144 defendants. A plea of privilege was filed by the Bank asking that the cause of action as to it be transferred for trial to Dallas County, its domicile. The venue question finally reached the United States Supreme Court where it was decided in favor of the Bank.[1]

On November 23, 1964 the trial court entered its order sustaining the Bank's motion for summary judgment. The order recites that it is "based on the pleadings, depositions, and admissions together with the affidavits on file * * *."

The depositions, taken at the behest of the Receiver on October 7, 1959, are those of Fred Florence, then President of the Bank, and James M. Cumby, a Senior Vice-President. In response to subpoenas *duces tecum* these officers produced numerous of the Bank's official business records describing in detail the transactions had between the Bank and Ben Jack Cage and Jack Cage & Company and between the Bank and ICT. It is on these official records that the Receiver chiefly relies to raise fact issues conforming to the allegations of his petition.

## I. FACTS

In his brief the Receiver says that his cause of action is founded on the allegations that certain sums deposited to the account of ICT under the guise of loans from the Bank were really "frozen" funds which by reason of a contractual agreement between the Bank and the alleged borrower could not be withdrawn by ICT. Therefore the said sums were not bona fide loans but were fictitious transactions which were part of a conspiracy to defraud ICT, its creditors, stockholders and the public. The Receiver further asserts that the Bank, because of its misrepresentations "is estopped to deny that these sums that were deposited to the account of ICT Insurance Company were not the unrestricted and unencumbered property of said ICT Insurance Company, and that said money when repaid to the Bank ws converted by the Bank and wrongfully misappropriated by the Bank."

More particularly in its brief the Receiver names five transactions which he claims were fraudulent on the part of the Bank and are the basis of his claims. We shall therefore describe each of these transactions in detail as disclosed by the records, affidavits and depositions which are before us.

1. LOAN OF $500,000, JUNE 28, 1952.

This loan was not made to ICT. It was made to Ben Jack Cage individually and to Jack Cage & Company, a corporation. The

---

1. See Mercantile Nat'l Bank at Dallas and Republic Nat'l Bank v. Langdeau Receiver, Tex.Civ.App., 331 S.W.2d 349; Langdeau, Receiver v. Republic Nat'l Bank, 161 Tex. 349, 341 S.W.2d 161; Republic Nat'l Bank v. C. H. Langdeau, Receiver, 371 U.S. 555, 83 S.Ct. 520, 9 L.Ed.2d 523; and Langdeau, Receiver v. Republic Nat'l Bank, Tex., 365 S.W.2d 783.

latter's charter empowered the company to "accumulate and loan money * * * to sell and deal in notes, bonds and securities * * * to subscribe for, purchase, invest in, hold, own, assign, pledge and otherwise deal in capital stocks, bonds * * * ", etc.; and "to borrow money * * * for carrying on any or all of the purposes above enumerated." Ben Jack Cage was President of Jack Cage & Company and of ICT.

An exhibit styled "Loan Application" is a memorandum made by Rex D. Johnson of the Bank's Credit Department for the consideration of the Bank's Loan Committee. It is not signed by Ben Jack Cage or Jack Cage & Company. We quote from this memorandum:

"Desire to borrow $500,000 at 4% payable $50,000 per month and secured by 21,704 shares of The Insurance Company of Texas and $400,000 term insurance on the life of Ben Jack Cage.

"The proceeds of the loan applied for are to be placed to the credit of The Insurance Company of Texas in this bank and to be used for the purpose of increasing the capital and surplus of the company.

"Mr. Cage states that The Insurance Company of Texas writes casualty insurance and that it is the owner of the capital stock of Continental Fire and Casualty Company and Life Insurance Company of Texas. A 'combined statement' as of May 21 has been furnished us and shows a net worth of about $1,154,000 after elimination of stock of the subsidiary companies carried at $810,000. Mr. Cage says that The Insurance Company of Texas is actively selling its stock to individuals in labor groups and that the majority of the present capital stock is so held. He says they have contacted about 3% of the labor membership in Texas and that 50% of those contacted have subscribed for stock. The subscriptions usually are on an installment basis and if a subscriber decides not to continue with his payments, his subscription is cancelled and he is issued stock to the extent of the amount paid-in. Present sale price of the stock is $23 per share."

\* \* \* \* \* \*

"It is Mr. Cage's estimate that he will be able to pay off the proposed loan within 60 days. Similar loans have been handled by the Mercantile National Bank but the company has concluded to establish two major banking accounts. He says that cash balances will be divided between us and Mercantile Bank and the proceeds of the loan herein will remain on deposit with us throughout the duration of this loan. A personal statement furnished us by Ben Jack Cage as of November 30, 1951 claims a net worth of $752,000."

This loan was recommended by Oscar Bruce, now deceased, then a Senior Vice-President of the Bank. The loan was approved by six members of the Loan Committee, including James M. Cumby, a Senior Vice-President, and Fred Florence, then President of the Bank. The depositions of both officers are part of the record. The note, dated June 28, 1952, was signed by Ben Jack Cage and Jack Cage & Company, secured by 21,704 shares of ICT and a $400,000 term life insurance policy on the life of Ben Jack Cage issued by Union Central Life Insurance Company. The loan was payable in monthly installments of $50,000. The deposit slip, initialed by James M. Cumby, shows the deposit to the account of ICT.

On July 29, 1952 W. J. Noad, Examiner for the Department of Insurance of the State of Texas addressed a form letter to the Bank stating that among the assets of ICT on June 30, 1952 was a deposit in the Bank. The Examiner further stated, *"For the sole purpose of verifying the books,* will you please fill out the attached certificate and return it in the enclosed stamped envelope." (Emphasis supplied.)

The bottom part of the above letter was a form to be filled out by the Bank. This form was filled out in part and signed for the Bank on July 30, 1952 by L. E. Elder, of the Auditing Department of the Bank. We quote from the certificate: "This is to certify that at the close of business June 30, 1952 the books of the above bank showed a balance of $500,922.00 due said insurance company, and subject to its check and withdrawal * * *." The certificate further stated that there were no certificates of deposit outstanding; and that on said date the said insurance company was not indebted directly or contingently to the Bank for borrowed money, discounted notes or under any form of agreement nor were any of the foregoing deposits held by the institution as security for any loan made to an officer, director or employee of said insurance company.

The Bank's ledger styled "Liability as Maker" on Ben Jack Cage is part of the record. It shows the loan of $500,000 on June 28, 1952. There are fourteen entries. At one time Ben Jack Cage owed the Bank as much as $900,000, having obtained two additional secured loans. Various amounts paid by Ben Jack Cage to the Bank are shown on the ledger. With a payment of $200,000 on October 3, 1952 the indebtedness of Cage to the Bank had been paid in full. The balance due on the note of June 28, 1952 was paid in full on September 23, 1952.

2. LOAN OF $920,000, OCTOBER 30, 1952.

This loan, like that of June 28, 1952, was made to Jack Cage & Company with the note co-signed by Ben Jack Cage personally. It was not a loan to ICT.

The record contains a document styled "Loan Application" dated October 10, 1952. It is not signed by Ben Jack Cage or Jack Cage & Company. It is really a memorandum from J. W. Keay of the Bank's Credit Department for the information of the Bank's Loan Committee. We quote part of this document:

"Jack Cage & Company, Inc., co-signed by Ben Jack Cage, wishes to borrow $920,000 @ 4% payable $100,000 monthly for five months beginning December 1, 1952 with the balance of $420,000 due and payable at the sixth month.

"Jack Cage & Company, Inc. will underwrite 40,000 shares of the capital stock of The Insurance Company of Texas. Cost to Jack Cage & Company, Inc. is $23.00 a share and the stock will be, in turn, sold to present shareholders of The Insurance Company of Texas at $25.00 per share. The borrowed funds are required by the applicants to finance the underwriting. "Loan will be secured by 40,000 shares of The Insurance Company of Texas at $23.00, cost = $920,000. The loan will be supported also by an assignment of the proceeds of stockholder subscriptions in The Insurance Company of Texas aggregating approximately 250,000 shares. Mr. Cage advises that these subscriptions are on an installment basis, and that as payments are received the subscription will be filled from the 40,000 share block pledged as collateral. We are to be provided a list of the subscriptions and the amount subscribed, but it is not contemplated that a collateral account will be required.

"Further supporting the loan, Jack Cage & Company, Inc. has pledged a $400,000 term life insurance policy on the life of Ben Jack Cage, which policy was written by the Union Central Life Insurance Company.

"The $920,000 requested herein will be deposited to The Insurance Company of Texas, Capital Account. Mr. Cage agrees that balances in the accounts of The Insurance Company of Texas will aggregate at least the unpaid balance of the loan. Cage also advises that The Insurance Company of Texas accounts and the Continental Union In-

surance Company's accounts will be active."

On October 28, 1952 Ben Jack Cage addressed and signed a letter to the Bank. We quote part of the letter:

"We propose the following loan:

"BenJack Cage and/or Jack Cage and Company desire to borrow $920,000.00 for the purpose of investing the entire amount· in 40,000 shares of ICT common stock, par value of $10.00, subscribed price at $23.00 per share, and present market value of $25.00 per share.

"Jack Cage and Company will pledge the 40,000 shares as collateral and in addition, will further collateralize the loan with subscriptions for stock totalling approximately 250,000 shares when such stock is available. These subscriptions are on the installment plan and it is our proposal that as the money comes in for these subscriptions, such subscriptions will be fulfilled from this 40,000-share block. Therefore, the Bank will have 100% collateral at all times for whatever amount of loan might be outstanding. In addition, it would have a ratio of approximately six shares subscribed to one share held as collateral, to practically guarantee a resale market for the stock. A copy of the Resolution authorizing this additional 40,000-share increase at the last stockholders meeting on October 18 is attached for your files. This 40,000-share issue is not for the general public but is to be distributed among the present stockholders who are paying for their stock in monthly installments. More than 85% of the outstanding stock of The Insurance Company of Texas was voting at the last meeting and I am happy to tell you that it was an unanimous vote in favor of making available to the present stockholders these 40,000 shares.

"It is proposed that this loan would be paid at the rate of $100,000.00 a month, paying both principal and interest each month.

"This loan will further be collateralized by a $400,000.00 life insurance policy on the life of BenJack Cage, the policies presently being in your possession.

"I shall appreciate your early approval as we desire to increase the size of The Insurance Company of Texas as promptly as possible in order that the company will be even stronger than before, thus attracting more agents and a continuously improved class of business. Thanks very much."

The loan was recommended by Oscar Bruce and was approved by several of the officers and directors of the Bank, including Fred Florence and James M. Cumby.

The note for $920,000 at 4 per cent interest is dated October 30, 1952 and is signed by Ben Jack Cage and Jack Cage & Company, payable $100,000 monthly for five months beginning December 1, 1952 with balance of $420,000 to be due and payable at the sixth month.

The "Collateral Ledger" of the Bank shows that the Bank received the collateral securing the loan.

In the record are documents showing the increase in the capital structure of ICT from $1,000,000 to $1,400,000, effected by an additional 40,000 shares of stock. The record further states that $400,000 was being credited to the capital of the company and $500,000 to its surplus.

On November 10, 1952 the sum of $920,000 was deposited in the name of ICT in an account styled "Capital Stock Account." The deposit slip is initialed as a "new temporary account" by James M. Cumby. On January 8, 1953 the ICT Capital Stock Account had $921,054.76 in it. On that date the entire amount of the deposit was transferred to the general account

of ICT in the Bank, which general account already contained the sum of $5,581.52.

On November 10, 1952 Oscar Bruce, the Bank's Senior Vice-President, who had recommended the loan, made an affidavit as follows:

"That The Insurance Company of Texas, a Texas Corporation, with principal office in Dallas, Texas, has on this date on deposit with the Republic National Bank of Dallas the sum of Nine Hundred Twenty Thousand Dollars ($920,000.00) in a Special Account titled 'Capital Stock Account', that said deposit is separate and apart from the general account of such corporation.

"That, insofar as this bank knows, there are no liens or attachments on said account and the entire sum of $920,000.00 is subject to the transfer or withdrawal by the proper recorded officers of the corporation."

The above affidavit was apparently sent to the Attorney General of Texas in connection with the amendment to the charter of ICT whereby the corporation increased its capital stock.

The Bank's "Liability as Maker" ledger shows that Jack Cage & Company made payments on this note as follows:

| | |
|---|---|
| "November 28, 1952 | $100,000 |
| December 3, 1952 | $100,000 |
| January 31, 1953 | $100,000 |
| February 26, 1953 | $100,000 |
| March 12, 1953 | $520,000 |
| Total | $920,000" |

The sum of $10,015.44 was also paid as interest.

3. LOAN OF $250,000, DECEMBER 31, 1952.

This loan was a loan to ICT recommended by Oscar Bruce, and approved among others by James M. Cumby.

The memorandum by Glenn Facka of the Bank's Credit Department contains the following recitations:

"AMOUNT:
   $250,000 at 4% for 10 days.

"COLLATERAL:
   Pledge of various insurance premium notes with an aggregate unpaid balance of $253,000.

"USE OF FUNDS:
The memorandum by Glenn Facka of the Bank's Credit Department contains the following recitations:

"LIQUIDATION:
   To be paid by maturity.

"REMARKS BY THE CREDIT DEPARTMENT

"This is a year end transaction of very short term nature.

"The Insurance Company of Texas is under the management of Ben Jack Cage whose relationship with this bank is well known to the committee.

"Latest statement dated September 30, 1952, shows total assets of $5,700,000 with capital and surplus of $2,490,000. According to Dun & Bradstreet, annual premium income is $450,000.00 or more."

The Bank's records show that the loan was evidenced by a note dated December 30, 1952 for $250,000 payable ten days after date, signed in behalf of ICT by Ben Jack Cage, President, and Francis J. Knoll, Secretary-Treasurer. The loan was secured by premium notes in the amount of $253,000 and by $250,000 worth of U. S. Treasury Bonds, which were to be purchased by the Bank for ICT from the proceeds of the loan. A deposit of $250,000 was credited to ICT on December 31, 1952.

On the same day the Bank pursuant to ICT's instructions bought $250,000 in U. S. Treasury Bills, which were pledged as col-

lateral (in addition to the $253,000 in premium notes), to secure the loan of $250,-000.[2]

The Treasury Bills, purchased by the Bank from a New York dealer, were not actually physically delivered to the Bank or ICT. However, the dealer confirmed the order, charged the Bank's account and gave the U. S. Treasury numbers of the Bills being held for the Bank. The record indicates that other customers of the Bank had also authorized the Bank to make year-end purchases of Treasury notes in their behalf, so that the total amount of Treasury Bills purchased by the Bank for its customers, including ICT, greatly exceeded the amount purchased for ICT. The amount purchased for ICT was allocated to ICT.

On January 2, 1953 pursuant to ICT's instructions the Bank sold all the Treasury notes it had bought for ICT and the proceeds of the sale were deposited to the account of ICT.

The Bank's "Liability of Makers" ledger shows that the $250,000 note was paid in full together with $55.55 interest on January 2, 1953. The next day the Bank returned to ICT its $250,000 note and the $253,000 in premium notes which had been pledged as collateral.

With reference generally to premium notes as collateral and also to year-end short term loans Cumby's testimony contained in his deposition was substantially as follows:

"It is a frequent and common occurrence for banks generally to make loans and to take insurance premium notes as collateral security. We do a good deal of it. I think it is good business. We have never had any bank examiner tell us that it is not a valid loan to make; and I don't recall ever having had one criticized by a bank examiner.

"Year end transactions are a common occurrence in the banking field with Republic Bank and other banks. The most common reason for converting assets of a corporation into government bonds over the year end is to attempt to save ad valorem tax. The government bonds are not subject to City, County or State ad valorem taxes; and if you have cash on hand it is subject to ad valorem tax. No one has ever told me that it is illegal for anybody to convert assets over the year end into government bonds. If it is illegal, we have violated the law a whole lot of times for our customers. Roughly we had four hundred year end transactions. Twenty-two of those were insurance companies."

Fred Florence in his deposition testified as follows:

"Q. Now, did Mr. Bruce ever discuss with you personally any of these BenJack Cage, or Insurance Company of Texas loans?

"A. Yes, he mentioned to me that he was, that they had applied for a loan at different times and that they would do this and this, and the collateral would be this and that, or something like that. And he did, and I knew something about these various loans from time to time."

\*    \*    \*    \*    \*    \*

"A. \* \* \* In some instances where they were borrowing some money against their collections on some of their stock subscriptions, where we made them some loans.

"Q. You knew that?

"A. And again, where at year-end, if we had a loan for tax purposes, and

2. Pursuant to ICT's instructions the Bank on December 31, 1952 bought a total of $1,100,000 worth of Treasury notes for ICT. The funds to pay for these Treasury notes came out of the $250,000 loaned to ICT and on deposit to its credit and

the balance out of the $920,000 also on deposit to ICT's account. Only $250,-000 of these Treasury notes (not the whole $1,100,000) were pledged as collateral for this $250,000 note.

other things, that they had borrowed some year-end."

\* \* \* \* \* \*

"Q. \* \* \* Now, number, 1: Did you at any time when this Bank was doing business with BenJack Cage, or Jack Cage & Company, or the Insurance Company of Texas, later changed to ICT, did you at any time know that it was hopelessly insolvent?

"A. I positively did not, \* \* \*."

\* \* \* \* \* \*

"A. \* \* \* We have no financial interest in this company or anything. It was just strictly a banking matter with us, \* \* \*.

"Q. Would you have any motive as an officer in this Bank to use this Bank's resources to keep an insurance company that is hopelessly insolvent to keep it going so that it could defraud people? \* \* \* That is the charge in this case.

"A. Well, I deny the charge without any reservation."

\* \* \* \* \* \*

"THE WITNESS: \* \* \* Some of them are afraid their money will be taxed and they want to draw it out and buy government bonds and they will want to do this, and some of them for other purposes, but they were considered normal banking transactions."

Fred Florence in his deposition in substance further testified as follows: Mr. Bruce and Mr. Cumby were the two principal officers of the Bank in the loans relating to insurance company matters. Though he did not remember the details, Florence did remember that the Bank had made loans to them. The Bank had never repudiated any of the actions of Bruce respecting the loans involving Ben Jack Cage, Jack Cage & Company or ICT. He positively denied that he knew ICT was insolvent at the time the Bank was doing business with Ben Jack Cage, or Jack Cage & Company, or ICT.

4. LOAN OF $400,000, DECEMBER 31, 1953.

This was another year-end transaction. On December 31, 1953 a Vice-President and General Counsel of ICT in a letter to the Bank requested the Bank to purchase certain premium notes, the proceeds of the sale to be used to purchase Treasury notes for ICT. The premium notes were to be repurchased by ICT on January 2, 1953 after resale of the Treasury Bills.

Notwithstanding the use of the words "purchase" and "repurchase" in the above letter the Bank records show that the resulting transaction was really a loan of $400,000 dated December 31, 1953 at 4 per cent interest to be paid January 2, 1954. This loan was approved among others by James M. Cumby. The records include an affidavit of Francis J. Knoll that he was delivering to the Bank a box containing installment premium notes in the amount of $584,000. These premium notes were held by the Bank as collateral. The Bank's records show that the proceeds of this loan were used to purchase Treasury Bills for ICT. The Bills were sold on January 2, 1954 and the proceeds of the sale used to pay ICT's note for $400,000 together with $88.88 interest. The box containing the premium notes in the amount of $584,000 was returned to ICT. The procedures followed in this transaction were substantially like those in the year-end transaction of 1952–1953 involving the $250,000 loan of December 31, 1952.

5. LOAN OF $400,000, DECEMBER 28, 1954.

This was a loan evidenced by ICT's note dated December 28, 1954 for $400,000 at 4 per cent interest due January 5, 1955 secured by installment premium notes totaling $565,277.87, the loan being recommended by Oscar Bruce. The various Bank records introduced by the Receiver show that this

loan was repaid on January 5, 1955 by ICT by check drawn on its account in the Bank. The box containing the $565,277.87 in premium notes was returned to ICT.

## MISCELLANEOUS

At the hearing on the Bank's motion for summary judgment counsel for the Receiver in the course of his argument in open court made these statements:

"* * * I don't charge a criminal act on the part of any person at the bank. Let it be clearly understood."

\* \* \* \* \* \*

"* * * I know Mr. (Fred) Florence only by reputation, and I know him to be an honorable man by reputation and *I make no implication against him.* I know Mr. Cumby, only having seen him once four years ago. *I make no implication concerning his honesty and integrity and I don't want that to be said,* but I simply say to Your Honor that neither Mr. Florence or Mr. Cumby were present and participated in these transactions. *That that was a man by the name of Oscar Bruce and again, I never saw him. I make no implications against him * * *."* (Emphasis supplied.)

In response to the court's inquiry whether there was evidence of any conspiracy between the Bank and Ben Jack Cage to do anything illegal, counsel for the Receiver made this statement in open court:

"Oh, Yes. * * * Now, if Your Honor said do I have proof that I can tell Your Honor today in candor of the lawyer's rules before the Court, that I can bring a witness and put him on that stand and have him hold up his hand to God and say that I heard those men conspire, I can't do that. I can offer circumstances which would tend to raise a reasonable belief from a reasonable prudent person that there was no other reason but that."

In response to the court's inquiry whether there was evidence that the Bank had "frozen" the funds on deposit, counsel for the Receiver made this statement in open court:

"Only this, Your Honor, that they did. * * * It didn't go out. * * * Now, whether or not, that was frozen or not, I say it is a circumstance that may lead the jury to believe it."

The above fact findings will be found in the transcript in a document styled "Order Covering Pretrial Conference."

Attached to the Receiver's reply to the Bank's motion for summary judgment is an affidavit by Charles T. Ramsey, Assistant Chief Examiner for the Texas State Board of Insurance. It is doubtful that this affidavit conforms to the requirements for affidavits prescribed in Rule 166–A(e), Texas Rules of Civil Procedure. The instrument certainly contains some legal conclusions which we cannot consider. But it does contain this statement of fact:

"I was, on September 20, 1956, assigned to examine ICT Insurance Company of Dallas, Texas, and to report to the State Board as to the financial condition thereof. *I commenced the examination in Dallas, on October 15, 1956. About the middle of December, 1956, I began to suspect that the company was insolvent, due to the holding of certain worthless assets, but the final picture of insolvency was not clear until the audit was complete.* I completed the audit about the end of January, or during the first few days in February, 1957, * * *." (Emphasis supplied.)

The Bank ledger sheets made at the time these transactions took place show the deposits, withdrawals and balances of ICT's

account after the loan of June 28, 1952. These sheets reveal that ICT did withdraw sums of money from its account during the life of the loan as follows: on July 23, 1952 the account was reduced from $500,922 to $450,922; on August 10, 1952 the balance was reduced to $275,222; on September 6, 1952 to $250,000. On August 13, 1952 ICT withdrew $85,500 by check payable to Dallas Title & Guaranty Company; also on August 13, 1952 ICT withdrew $55,000 by check payable to Dallas Title & Guaranty Company; on September 6, 1952 ICT withdrew $25,000 by check payable to Continental Fire & Casualty Company; and on September 17, 1952 ICT withdrew $100,000 by draft payable to Mercantile National Bank.

## II.  OPINION

In his brief the Receiver presents only one point on appeal. Since the Bank attacks the sufficiency of this point we quote it in full:

"The trial Court erred in granting the Motion for Summary Judgment filed by Republic National Bank of Dallas because the pleadings, deposition, admissions and affidavits show that there are genuine issues of material facts to be tried; and Appellee failed to show that there is no genuine issue as to any material fact."

■ We agree with the Bank that the point of error does not comply with Rule 418, T.R.C.P. It has been held that such a point of error is too general and indefinite to require our consideration. Missouri-K-T R.R. Co. v. McFerrin, 156 Tex. 69, 291 S.W.2d 931; Blackburn v. Manning, Tex.Civ.App., 307 S.W.2d 347; McDonald v. Grant, Tex.Civ.App., 312 S.W.2d 694; Flock v. Kelso, Tex.Civ.App., 366 S.W.2d 698. However, in his statement and argument under his point of error the Receiver does become more definite by naming and discussing the five transactions to which

we have referred earlier in this opinion. Therefore, we shall proceed to consider his point of error. White v. Great American Reserve Ins. Co., Tex.Civ.App., 342 S.W.2d 793; Ballard v. Associates Inv. Co., Tex. Civ.App., 368 S.W.2d 232.

The Receiver in his brief frankly states that "Plaintiff's suit is founded essentially on the principles announced by the Supreme Court of Texas in Wheeler v. American National Bank of Beaumont, et al. [162 Tex. 502], 347 SW2d 918." The pleadings in the cited case apparently served as a model for the pleadings in this case. The two cases are indeed similar in some respects but they are quite dissimilar in other material respects.

■ The case relied on by the Receiver, unlike the case now before us, was decided solely on the pleadings. The one ultimate question was whether the allegations of the Receiver stated a cause of action. Of course in deciding the question the Supreme Court necessarily accepted the allegations as true. In the instant case we are dealing with a summary judgment. Here the question we must decide is whether the evidence adduced in connection with the Bank's motion raised any genuine issue as to any material fact. Rule 166-A(e), T.R.C.P. In this summary judgment proceeding the unsworn pleadings of the Receiver cannot be accepted as true they are not even evidence of the truth of their allegations. Keahey v. Dallas Teachers Credit Union, Tex.Civ.App., 374 S.W.2d 450; Hansen v. Eagle Mountain-Saginaw Ind. School Dist., Tex.Civ.App., 373 S.W.2d 817; Huie v. Thompson, Tex.Civ.App., 364 S.W.2d 280.

Some of the highlights in the opinion in the American National Bank case are as follows: (1) the Receiver's petition failed to state a cause of action against the Bank based on conspiracy; (2) the Supreme Court did not reach the question "whether the receiver is also entitled to sue and re-

cover for fraud on the creditors and public resulting from the publication of false statements"; (3) the Receiver's cause of action was limited to his alternative plea in which he pled fraud, estoppel and conversion; (4) accepting the allegations in the alternative pleading as true, the Supreme Court said, "The banks are estopped to deny that the funds represented as belonging to the company were the absolute property of the latter. The Receiver clearly has a cause of action for recovery *of company assets* alleged to have been misappropriated by the individual conspirators." (Emphasis supplied.)

In his petition the Receiver in this case alleges:

"Comes now CLAY COTTEN, in his representative capacity as the duly authorized and acting Receiver of ICT Insurance Company *and as representative of ICT Insurance Company and its creditors, claimants, policyholders and stockholders and as a representative of the public interest* * * *." (Emphasis supplied.)

■ Certainly a receiver for an insolvent insurance corporation such as ICT has a right to maintain a suit which is necessary to preserve the corporation's assets and to recover assets of which the corporation has been wrongfully deprived through fraud. In such a suit the receiver may be said to sue as the representative of the corporation and its creditors, stockholders and policyholders, for they have an interest in the corporation's assets and upon liquidation they are entitled to a proper distribution of the assets.

■ But some actions for fraud are by their nature personal to each creditor, or each stockholder, or each policyholder, and the receiver may not then maintain a suit in his representative capacity for their joint benefit. In such case each claimant and he alone may bring and maintain the suit himself, for the action is personal, separate and several, not joint, and extends no further than the individual loss of each particular creditor who sues. For example, one who proves that he relied on false representations as to the corporation's financial condition and was thereby induced to extend credit to the corporation, or to purchase stock in it, or to take out an insurance policy with it, must in his own name maintain a separate suit for his damages against the person who uttered the fraudulent representations. The aggrieved party and he alone may maintain the suit. Even then a creditor, stockholder, or policyholder who did not know or rely on such false representation, or was not induced by it to extend credit or invest his money cannot recover for the alleged fraud. The receiver has no right to bring or maintain such a suit. This view finds support in these authorities: Seale v. Baker, 70 Tex. 283, 7 S.W. 742; Jackson v. Bowie, Tex. Civ.App., 114 S.W.2d 342; Thomason v. Miller, Tex.Civ.App., 4 S.W.2d 668; Bergeson v. Life Ins. Corp. of America, 10 Cir., 265 F.2d 227; Price v. Union Land Co., 8 Cir., 187 F. 886–889; Kinter v. Connolly, 233 Pa. 5, 81 A. 905; Patterson v. Franklin, 176 Pa. 612, 35 A. 205; Orbison v. Lesh, 205 Ind. 340, 184 N.E. 771; Houston v. Thornton, 122 N.C. 365, 29 S.E. 827; 25 Tex.Jur.2d 639.

■ We therefore hold that in this case the Receiver represents the creditors, stockholders and policyholders and may sue the Bank for its alleged fraud for their benefit only to the extent that his cause of action seeks to preserve or recover the assets of ICT. He may not maintain a suit as representative of any individual creditor, stockholder, or policyholder who may claim that he was induced by the alleged false representations of the Bank to extend credit or invest his money in ICT and thereby sustained damage individually because of said alleged false representations.

■ A careful examination of the record convinces us that there is no genuine

issue of material fact as to the Receiver's allegations of fraud on the part of the Bank. The undisputed evidence shows that the alleged false representations of the Bank were not in fact false—the representations were true. But even if we were to say that they were false we would be compelled to say further that they neither added anything to or took anything away from the assets of ICT, therefore the Receiver has no basis for his claim of damages to ICT.

The evidence shows that the facts set out in the certificate of L. E. Elder of July 30, 1952 and the affidavit of Oscar Bruce dated November 10, 1952 were true, not false. The Bank had loaned $500,000 and $920,000 respectively to Ben Jack Cage personally and to Jack Cage & Company, not to ICT. The loans were secured by ample collateral—21,704 and 40,000 shares of ICT stock plus a $400,000 life insurance policy of Ben Jack Cage.

Jack Cage & Company was chartered to buy, sell, and deal in stocks. The purpose of the loans was plainly stated. The $920,-000 loan was to enable Jack Cage & Company to purchase and later sell the new issue of capital stock of ICT—in other words, to underwrite the new issue. The borrowers had no legal right to pledge ICT's money and there is no evidence that they entered into any contract to do so, or that the Bank required them to do so, or that they attemped to do so.

The record shows that by March 12, 1953 the loan of $920,000 had been fully paid by Jack Cage & Company in four monthly installments of $100,000 each, beginning November 28, 1952, and one installment of $520,000 on March 12, 1953. Yet on January 8, 1953 ICT's account contained $926,-636.28, and on March 4, 1953 showed a balance of $907,446.51. This certainly is not evidence that the money placed in ICT's account had been used to pay the $920,000 borrowed by Ben Jack Cage and Jack Cage & Company on November 10, 1952.

The Receiver says that the two loan transactions between the Bank and Jack Cage & Company and the three loan transactions between the Bank and ICT "enabled" ICT to make false statements in regard to its financial condition. But such fact, if it is a fact, furnishes no basis for holding the Bank guilty of fraud in the absence of any showing that the Bank knew or was a party to a false financial statement made by ICT. It is doubtless true that in every instance when a bank lends money it thereby "enables" the borrower, if he is so inclined, to make false financial statements.

When his deposition was taken in 1959 James M. Cumby was unable to produce an itemized list of the premium notes contained in a box, which notes were assigned to the Bank as collateral security in each instance for the loans of December 31, 1953 and December 31, 1954. The Receiver seizes on this circumstance as a basis for an inferense of fraud on the part of the Bank.

In his deposition Cumby testified as follows:

"Q. I assume that insurance premium notes aggregating that large a figure, would be quite a number of notes?

"A. Yes."

\*     \*     \*     \*     \*     \*

"Q. And would you normally expect to find a list of that attached to the collateral?

"A. We would normally except to find an adding machine tape of the totals involved, yes.

"Q. You have found no such instrument among your papers or records?

"A. It is possible that that tape was handed back to the company when the loan was paid.

"Q. Uh huh.

"A. It is also possible that we may have had such a list, but in our permanent records we don't find any such list."

In our opinion Cumby's inability in 1959 to produce an itemized list of the premium notes in question is not a circumstance which has any probative value as a basis for an inference of fraud on the part of the Bank against ICT. Nowhere does the Receiver allege or undertake to prove that the premium notes in question were not actually present in the box. If the notes were not there (there is no evidence they were not) it would be a fraud perpetrated by ICT on the Bank, not a fraud perpetrated by the Bank on ICT. Moreover, the Bank had a right to lend money to ICT without requiring any security whatever. The loans were paid by ICT when due and the box containing the premium notes was returned to ICT. It cannot be said that in the transaction the Bank deprived ICT of any of its assets. The record is totally barren of any evidence that the Bank sold or conveyed any "worthless assets" (to use the phrase of Ramsey, the Board's inspector) to ICT.

In his brief the Receiver says:

"The Plaintiff's cause of action is founded on the allegations that *the Bank is estopped to deny that these sums that were deposited to the account of ICT Insurance Company were not the unrestricted and unencumbered property of said ICT Insurance Company,* and that said money when repaid to the Bank was converted by the Bank and wrongfully misappropriated by the Bank, * * *." (Emphasis supplied.)

■ The Receiver's claim of estoppel in the instant case requires careful analysis lest it be misunderstood. He contends that the loan contract between the Bank and the borrower (whether the borrower be Ben Jack Cage, Jack Cage & Company, or ICT) actually provided that the money loaned could not be withdrawn by the borrower, but was to remain on deposit with the Bank as security for the loan. In keeping with this contention he alleges that the Bank "is estopped to deny" that the sums deposited "were not the unrestricted and unencumbered property of said ICT Insurance Company." In other words, the Receiver in effect alleges that the Bank is estopped to deny that the sums deposited *were* the *restricted and encumbered* property of ICT and that by so restricting and encumbering the property of ICT and using the said sums to repay a fictitious loan, the Bank in effect converted ICT's property to its own use.

The record shows that the Bank has consistently denied that the sums deposited in the account were restricted and encumbered as claimed by the Receiver. The Bank by its records, its certificates, its pleadings and its brief has consistently represented that the sums on deposit were unrestricted and unencumbered and could be withdrawn by the company in whose account the deposit was credited. Such representations cannot furnish the basis for an estoppel by which the Bank cannot deny the Receiver's claim that the sums deposited "were not the unrestricted and unencumbered property of ICT" which could not be withdrawn. The record does not disclose any instance when the Bank has represented to ICT or the Board of Insurance Commissioners or the Receiver that the sums on deposit were restricted or encumbered as claimed by the Receiver, thereby estopping itself to deny the Receiver's claim.

To support his position the Receiver relies on alleged statements by Ben Jack Cage that enough money would be kept on deposit to cover the amount of the loan. But these statements referred to only two of the five loan transactions. Moreover, they were not contractual in nature. They were ex parte statements alleged to have

·been made by Ben Jack Cage, one of them in a letter signed by Cage. There is no evidence that the Bank entered into contractual agreement with Ben Jack Cage, Jack Cage & Company, or ICT whereby the deposits in the account of ICT were restricted or encumbered as claimed by the Receiver. To the contrary James M. Cumby, who approved four of the five loans, in his deposition denied that the deposits in the account of ICT were "frozen" as security for the loans or in any way restricted. His testimony is uncontradicted.

■ If it be said that Cumby's testimony is that of an interested witness because he was an officer of the Bank we think that his uncontradicted testimony must nevertheless be accepted as conclusive because it is corroborated by other evidence. Travelers Ins. Co. v. Jordan, Tex.Civ.App., 339 S.W.2d 235, 239; Texas & Pacific Ry. Co. v. Moore, Tex.Civ.App., 329 S.W.2d 293, 295; Commercial Travelers Casualty Co. v. Johnson et ux., Tex.Civ.App., 217 S.W.2d 160, 165; Simonds v. Stanolind Oil & Gas Co., 134 Tex. 332, 114 S.W.2d 226, 136 S.W.2d 207, 208; Great Southern Life Ins. Co. v. Dorough, Tex.Civ.App., 100 S.W.2d 772, 776.

The corroborating evidence is as follows:

1. The ex parte statements or promises attributed to Ben Jack Cage were made only in connection with the first two loans, that of June 28, 1952 for $500,000 and that of October 10, 1952 for $920,000. Neither of these loans was made to ICT although the proceeds, on order of Cage, were deposited to the credit of ICT.

2. The Bank's ledger sheets of ICT's deposits, withdrawals and balances show that during the life of the loan of June 28, 1952 ICT did make withdrawals from its account, thus negating the charge that its account was frozen for the duration of the loan. For details see statement under "Miscellaneous" in the factual statement of this opinion.

3. Every loan made by the Bank either to Ben Jack Cage, or Jack Cage & Company, or to ICT was amply secured by collateral in the form either of ICT stock certificates, or premium notes, or a $400,-000 life insurance policy of Ben Jack Cage, or United States Treasury notes, or a combination of such collaterals. This strongly supports Cumby's testimony that the Bank was not looking to the money in ICT's account as security for the loan, but was looking to the collateral above mentioned.

4. There is no evidence that the Bank knew or should have known that ICT was insolvent. There is evidence to the contrary. This statement will be amplified later.

5. Every one of the five transactions of which the Receiver complains was a regular banking transaction so far as the testimony and official records of the Bank show. In every instance the Bank actually paid out its money as a loan, ample security was taken (not the money loaned), proper records were made, the loans including interest were repaid, and the notes and collateral returned to the borrower.

6. The statement of the Receiver through his counsel at the hearing on the Bank's motion for summary judgment, that he made no "implications" concerning the honesty and integrity of Fred Florence, James M. Cumby or Oscar Bruce, certainly tends to negate the Receiver's charges of fraud, misrepresentation and conversion on the part of the Bank. Cook v. Winter, Tex.Civ.App., 207 S.W.2d 145, 148; 7 Tex. Jur.2d 104. Bruce was the officer who recommended the loans; Cumby was one of the officers who approved four of the five loans; and Florence was President of the Bank, who approved at least two of the loans.

Both Cumby and Florence testified that they did not know ICT was insolvent. Their testimony in this regard is corroborated by the following:

1. In connection with the loans the Bank was furnished with financial statements showing ample net worth of the borrowers.

2. Charles T. Ramsey, an accountant and Assistant Chief Examiner for the Texas State Board of Insurance for several years, in his affidavit states that he was assigned to examine ICT; that he began his examination October 15, 1956; that about the middle of December, 1956 he "began to suspect that the company was insolvent due to the holding of certain worthless assets, * * *" but the final picture of insolvency was not clear until he finished his audit at the end of January 1957. The testimony of Cumby and Florence that they did not know that ICT was insolvent finds some support in the fact that a trained investigator and accountant with full access to the books and records of ICT did not "begin to suspect that the company was insolvent" until he had spent more than two months examining the company and its records.

3. The Insurance Code of Texas, V.A. T.S., as passed by the Legislature in 1951 was in effect when the transactions here involved took place.[3] Articles 1.14, 1.15, 1.10(7), 3.07, 3.08 and 1.18, provided in substance that the Board of Insurance Commissioners should issue a certificate to do business to an insurance company if it should be satisfied that the company had complied with the law in regard to capital stock surplus, etc.; should at least once every two years examine each company; should suspend the entire business of the company if it was found to be fraudulently conducted; should require the filing of an annual statement after January first and before March first of each year; should issue renewal certificates if such statement showed a condition which entitled the company to continue to transact business; and should bind its examiners under oath not to "*reveal the condition of, nor any information secured in the course of any examination * * * to anyone except the Members of the Board of Insurance Commissioners,* * * *.*" (Emphasis supplied.)

In May 1950 ICT received its original certificate to do business. It had been doing business more than two years before the Bank had its first transaction with Ben Jack Cage, or Jack Cage & Company or ICT. It had been doing business more than four years prior to the last of the five transactions.

■ We agree with the Receiver that the Bank was charged with notice of the provisions of the Insurance Code. It was also charged with a knowledge of the law that public officials are presumed to have done their duty. Anderson v. Polk, 117 Tex. 73, 297 S.W. 219, 222; 47 Tex.Jur.2d 153. Therefore the Bank was entitled to believe, in the absence of evidence to the contrary, that the Board of Insurance Commissioners had made the necessary examinations of ICT and had been satisfied by its annual statements that it was solvent. These circumstances tend to corroborate the testimony of Cumby and Florence that they did not know that ICT was insolvent.

■ In its exceptions to the Receiver's petition, in its answer to the merits, in its motion for summary judgment and in a counterpoint on appeal the Bank insists that the Receiver's cause of action is barred by the two year statute of limitations. Art. 5526(2), Vernon's Ann.Civ.St. expressly applies to an action for conversion. We have concluded that the Bank is correct.

3. The Receiver in his brief cites several provisions of the Insurance Code which provisions are parts of the 1955, 1959 and 1961 amendments to the Code. These amendments were not in effect when the transactions here involved took place, so are not applicable in this case.

The record shows that the five loans which are challenged by the Receiver were paid in full with interest on the following dates:

(1) By Ben Jack Cage and Jack Cage & Co. .......... September 23, 1952
(2) By Ben Jack Cage and Jack Cage & Co. .......... March 12, 1953
(3) By ICT .................................... January 2; 1953
(4) By ICT .................................... January 2, 1954
(5) By ICT .................................... January 5, 1955

---

C. H. Langdeau, one of the predecessors of the present Receiver, filed suit against numerous defendants, including the Bank, on November 6, 1958.[4] Thus it will be seen that in every instance the Receiver's suit was filed more than two years after the five transactions had been concluded.

The Receiver in answering the Bank's plea of limitations seeks to invoke the well-known general rule that in a case of fraud the plaintiff only has to exercise reasonable diligence from the date of the discovery of the fraud or from the date when by the exercise of reasonable diligence he should have discovered the fraud. The Receiver cites Smith v. Talbot, 18 Tex. 774 and Hudson v. Wheeler, 34 Tex. 356. See also 26 Tex.Jur.2d 26. He then asserts that the question of reasonable diligence is a fact question, citing Munson v. Hallowell, 26 Tex. 475; McCarthy, Inc. v. Knox, Tex. Civ.App., 186 S.W.2d 832. We do not question the authorities cited by the Receiver, but in our opinion the rule when properly interpreted with reference to the undisputed facts of this case is not applicable.

We think the rule applicable here is aptly stated in Prosser v. First National Bank, Tex.Civ.App., 134 S.W. 781, 784 as follows:

"It is the law in this state that neither fraud alone nor ignorance of its existence will prevent the statute of limitation from running. The ignorance which affects such a result must be attended with such concealment of the fraud as will prevent its discovery by the exercise of reasonable diligence."

The rule as above stated has been upheld in many cases. It has often been held to be applicable where there has been no affirmative act of concealment by the accused party. Grace v. Parker, Tex.Civ.App., 337 S. W.2d 518; Knox v. Stephens, Tex.Civ. App., 285 S.W.2d 883; Wichita Nat'l Bank v. United States F. & G. Co., Tex.Civ.App., 147 S.W.2d 295; Davidson v. Atmar, Tex. Civ.App., 243 S.W. 662; Citizens Nat'l Bank v. Good Roads Gravel Co., Tex.Civ. App., 236 S.W. 153; Meyer Bros. Drug Co. v. Fry, Tex.Civ.App., 48 S.W. 752; Rayner Cattle Co. v. Bedford, 91 Tex. 642, 44 S.W. 410 (writ ref., 91 Tex. 642, 45 S.W. 554); Ark. Natural Gas Co. v. Sartor, 5 Cir., 78 F.2d 924; 26 Tex.Jur.2d 30.

We believe the Receiver's cause of action is barred under Art. 5526(2), V.A.C.S. because (1) the Bank did not exercise any concealment, fraudulent or otherwise, of the five transactions of which the Receiver complains; and (2) the transactions themselves as shown by the undisputed evidence were not fraudulent. As we have held earlier in this opinion the representations of the Bank were not false—they were true.

The Receiver's point on appeal is overruled.

The judgment of the trial court is affirmed.

Affirmed.

---

4. A previous suit had been filed on June 26, 1958 by V. F. Taylor purporting to act as Receiver of ICT. But our Supreme Court held that Taylor's appointment was void. State Board of Ins. v. Betts (Taylor), 158 Tex. 612, 315 S.W.2d 279. Therefore the suit filed by Taylor did not toll the statute of limitations, nor did a subsequent court order attempting to consolidate Taylor's suit with this action add anything to the present suit.