J. D. WHEELER, RECEIVER OF TEXAS MUTUAL INSURANCE
COMPANY V. AMERICAN NATIONAL BANK OF BEAUMONT, ET AL.

No. A-8088. Decided June 28, 1961
Rehearing overruled July 26, 1961
(347 S. W. 2d Series 918)

*Cecil C. Roach,* of Austin, *Tatum & Hall,* of Beaumont, and *Groce & Hebdon* and *Charles L. Smith,* of San Antonio, for petitioner.

*Orgain, Bell & Tucker, Strong, Moore, Pipkin, Strong & Nelson,* and *Marcus, Weller & Evans,* all of Beaumont, for respondents.

MR. JUSTICE SMITH delivered the opinion of the Court.

On January 19, 1955, J. D. Wheeler, as Receiver for Texas Mutual Insurance Company, filed a cross-action in a suit styled E. E. Langham et al. v. Hergot S. Lowry et al, pending in the 60th District Court of Jefferson County, Texas, to recover actual and exemplary damages on the principal basis of a conspiracy to defraud against certain individuals, who were alleged to have been organizers, officers, and directors of Texas Mutual; the First National Bank of Beaumont, Texas, hereinafter referred to as First National Bank; the American National Bank of Beaumont, Texas, hereinafter designated as American National Bank; V. C. Thompson, an examiner for the Board of Insurance Commissioners of the State of Texas, hereinafter referred to as Thompson; Samson Carr, hereinafter referred to as Carr, and Carl A. Kohler, hereinafter referred to as Kohler.

On February 10, 1956, the trial court sustained a plea of privilege as to certain individual defendants. Thereafter, the Court ordered a severance and separate trial of the Receiver's cross-action against the First National Bank, the American National Bank, Thompson, Carr, and Kohler. This severed cause of action was styled J. D. Wheeler, Receiver of Texas Mutual

Insurance Company v. The American National Bank of Beaumont et al.

The banks and Thompson filed motions to dismiss and pleas in abatement alleging that the Receiver's complaint did not state a cause of action against them.

On March 30, 1956, such motions were sustained. The Receiver refused to amend, whereupon the suit as to Thompson and the banks was dismissed. The Court on its own motion dismissed the defendants Carr and Kohler from the suit.

On appeal the Court of Civil Appeals at Beaumont, Texas, affirmed the judgment of the trial court in so far as the banks, Carr, and Thompson were concerned, but reversed and remanded as to Kohler, 338 S.W. 2d 486. Kohler has not filed an application for writ of error. Therefore, the judgment of the Court of Civil Appeals as to him is final.

The controlling question here is whether the cause of action asserted against the two banks, Thompson, and Carr may be prosecuted by the Receiver of the Texas Mutual Insurance Company on the theory that the recovery sought by the Receiver is for assets belonging to Texas Mutual. The trial court and the Court of Civil Appeals have sustained the pleas in abatement on the theory that the suit is one for damages personal to policyholders, claimants, and creditors of Texas Mutual, for which they alone can bring suit.

In dismissing the suit as to the banks and the above named parties on the ground that the alleged cause of action against the banks could not be prosecuted by the Receiver of the Texas Mutual Life Insurance Company, the trial court and the Court of Civil Appeals incidentally passed upon and dismissed the alternative contention raised by the pleadings of the Receiver that the banks, if not liable on the general conspiracy cause of action, then at least such banks should be held liable on the theory that each bank should be held for the amount it represented was on deposit in its bank. This theory of estoppel as to the banks is presented here by the Receiver through points asserting that the Court of Civil Appeals erred in holding that the banks did not convert and/or misappropriate assets of Texas Mutual, and erred in holding that the banks were not estopped to deny that Texas Mutual and its creditors, claimants, and policyholders were the owners of and entitled to those sums of

money which each bank "falsely" represented Texas Mutual to own.

This appeal will turn on the construction of the Receiver's pleadings. The pleadings consist of more than one hundred and sixty legal-size pages. In passing upon the questions before us, we do not pass upon the merits of this suit. We are not concerned with whether the allegations contained in the petition can be proved. The Receiver's allegations, so far as this appeal is concerned, must be accepted as true. All references in this opinion with respect to the facts relate solely to the allegations in the Receiver's pleadings.

∎ We have conceded that the Receiver had the right to maintain this cause of action on behalf of the creditors, policyholders, and claimants of the Texas Mutual, and that the Court of Civil Appeals erred in sustaining the pleas in abatement and in dismissing this suit. However, we have also concluded that the pleadings, so far as the banks are concerned, fail to connect the banks with the alleged overall conspiracy. The Receiver's cause of action as to the banks is limited to his alternative pleadings wherein he alleges that by virtue of the transaction entered into between the First National Bank and the American National Bank and the officers of the Texas Mutual pertaining to the $20,000 fictitious loan transaction involving the First National Bank to obtain the permit to do business in Louisiana; the $20,000 1950 year end fictitious loan transaction between Texas Mutual and the First National Bank; the $50,000 1950 year end fictitious loan transaction between Texas Mutual and the American National Bank; the $50,000 Taylor draft transaction between Texas Mutual and the First National Bank; and the $25,000 1951 year end fictitious loan transaction between Texas Mutual and the American National Bank, the banks were aiding the officers of the Texas Mutual in creating fictitious assets of the Texas Mutual so that the officers could represent to the Insurance Commission of Texas and to the Insurance Commissions of other states in which the company was operating that Texas Mutual had the necessary surplus required by law to do an insurance business. It is alleged that such transactions were fraudulent and that by virtue of such fraudulent transactions the First National Bank and the American National Bank are estopped to deny that the Texas Mutual was the owner of such sums of money, and that when they took back such assets under the guise of repayment of purported loans, they converted and misappropriated the assets of Texas Mutual in fraud of Texas

Mutual and its claimants, creditors, and policyholders. The alternative pleadings, in effect, allege that the furnishing of money to be deposited in the bank and the certification by the banks that Texas Mutual had at certain specific times money on deposit with them, and the arrangement between the management of Texas Mutual and the banks was such that the money was loaned to Texas Mutual under circumstances whereby it could not be removed from the bank without the signature or approval of the bank itself and its officers, were false and that the making of such false certificates was for the purpose of leaving the impression with the Insurance Commission that the Texas Mutual was in better financial condition than the true facts would reflect. Under such pleadings, the liability of each bank is limited to the amount it represented Texas Mutual had on deposit.

The facts alleged by the Receiver in his alternate plea concerning the banks entering into the above enumerated transactions to aid Texas Mutual in bolstering its assets are comparable in principle to such cases as McWhirter v. First State Bank of Amarillo, Tex. Civ. App., 182 S.W. 682, wr. ref.; Shaw v. Borchers, Tex. Comm. App., 46 S.W. 2d 967, and Farmers State Bank in Merkel v. Largent, Tex. Civ. App., 132 S.W. 2d 482, wr. ref., where makers of promissory notes gave their notes to a bank in order to aid the bank in its original incorporation. In those cases, the Court held that in a situation where the note was executed to aid the bank in bolstering its assets and to show false assets to bank examiners in making examinations for the State, the maker of the note was estopped to assert its invalidity as to the Receiver of the bank. In such cases, where a fraud action was brought against the maker of the note, the courts have held that the Receiver is the proper party to bring the suit and not the creditors or depositors of the insolvent bank.

The Receiver argues that a cause of action has been alleged in the present case, in that the banks having knowingly misrepresented the financial condition of the Texas Mutual as reflected by the bank records, the banks are estopped to urge the falsity of the banks' own statements.

We can see no sound distinction between the present case and the case of Golden v. Cervenka, 278 Ill. 409, 116 N.E. 213. The facts in the Golden case are lengthy and somewhat involved, but the acts alleged against the Central Trust Company in that case are very similar to the acts alleged against the banks in the

present case.  In the Golden case, the Receiver of the defunct LaSalle Street Trust & Savings Bank brought an action against the stockholders to enforce the stockholders' statutory double liability and also joined in such action an action against the Central Trust Company of Illinois, to recover assets of the insolvent bank in the amount of $1,250,000 that the Central Trust Company, another bank, had converted to its own use.

As to the cause of action alleged against the stockholders to enforce their statutory double liability, the Court held that under the Constitution of Illinois, the Receiver could not maintain such action, since under the Constitution such right was given exclusively to the creditors.  However, the Court held that the Receiver had the right to maintain the action against the Central Trust Company, and affirmed the judgment of the trial court in favor of the Receiver against the Central Trust Company.

The laws of Illinois under which the State Bank was organized required the payment of capital and surplus in cash before the bank could commence business and before the issuance of the Auditor's Certificate.  The scheme devised to evade the laws of Illinois was to have the stockholders of the National Bank subscribe to the stock of the new State Bank, with no intention that such subscriptions would be paid, and to temporarily obtain $1,250,000 from the Central Trust Company so that the officers of the newly organized State Bank, the LaSalle Street Trust & Savings Bank, could then make an affidavit, as required by law, to the Banking Commissioner that the full amount of capital stock and surplus of $1,250,000 was actually paid in cash as required by law and that such amount of cash was in the hands of the proper officers to be used solely in the legitimate business of the bank and so that the officers could further physically exhibit $1,250,000 in cash to satisfy the Banking Commissioner that the new state bank actually possessed such sum in capital and surplus and was entitled to commence business.

After obtaining the charter and license for the new bank, the scheme was then for the new state bank to take over the national bank's assets, assume its liabilities and then have the stockholders in the old national bank to exchange their stock for stock in the new state bank.  Under the arrangement, the new bank started operating on the assets and liabilities of the old bank and since the old bank was insolvent, and since due to the fact that the $1,250,000 allegedly dedicated to the business of the new bank was not in fact so dedicated, the new bank started

operating in an insolvent condition and after about two years operation wound up in receivership.

In sustaining the judgment of the trial court against the Central Trust Company for the $1,250,000 it had gratuitously permitted the new bank to use and represent to be its assets, the Court held:

"Since the statute contained no provision for the conversion of the national bank into a state bank, there was no provision of law for the examination of the national bank of the state authorities before the transfer. The statute contemplated only one method of organizing the state bank, and only one character of assets. *The auditor had no authority to issue a certificate authorizing the bank to commence business, unless he was satisfied that it possessed in cash the amount of capital and surplus named. The grant of authority to commence business was based upon the possession of the money. The affidavit of the directors stated that the money was in the hands of the proper officers, and the money was paid over to Lorimer by the Central Trust Company upon the check of the LaSalle Street Trust and Savings Bank. The object of the Banking Act is the protection of depositors and creditors of the bank, and the requirement of the possession of the whole amount of capital and surplus in cash at the organization of the bank is for their benefit. Whoever becomes a creditor of the bank has a right to rely upon its capital as a fund whereby its indebtedness is secured, and any loss incurred in its business may be made good, so that the depositors or other creditors may not suffer. The elaborate system of notes, checks, and bookkeepers' entries, debit and credit, do not affect the substance of the transaction. They did not create any cash, and if none of those documents had been executed and none of the entries made the substance of the transaction would still have been the same, and that was, that the Central Trust Company, at Lorimer's request, permitted him to hand to the auditor's representative $1,250,000 of the trust company's money as the money which the directors of the LaSalle Street Trust & Savings Bank had in their affidavit stated was in the hands of the officers of the bank, to be used solely in its legitimate business.* Of course, the auditor's agent was not brought there to satisfy himself that there was that much money in some bank in Chicago, and, of course, nobody thought so. The counting of the money is spoken of as a technical requirement of the

auditor, but if it is properly regarded as a technical requirement nobody could reasonably imagine that the counting of $1,250,000 of anybody's money would satisfy the requirement. It was the bank's capital and surplus about which the auditor was required to satisfy himself, and the exhibition and delivery of the money to him was as the bank's capital, which was stated in the affidavit to be in the possession of the bank's officers, and was produced from their depositary for his inspection. This amounted to a solemn declaration that the particular currency which was there present was the property of the LaSalle Street Trust and Savings Bank, dedicated solely to its business and subject absolutely to its control. The Auditor's certificate was based on this representation. *All persons giving credit to the bank were entitled to rely upon the auditor's certificate, and it is in accordance with the plainest principles of equity that no person who procured that certificate to be made could afterward be permitted to deny its truth, or the truth of his representation on which it was based, as against a subsequent creditor of the bank who was injured by reason of its falsity. It is immaterial whether such subsequent creditor knew of the previous representation or not. If he was injured by reason of the false certificate he has a right to seek redress against those who caused it to be made. It is also immaterial whether the Central Trust Company or Dawes had any fraudulent intention, knew anything about the condition of the national bank or made any profit out of the transaction. The trust company is estopped, as against creditors who had a right to rely upon the auditor's certificate, to deny that the cash exhibited was the property of the trust and savings bank, for which the trust company must account as a part of the bank's capital.*" [Emphasis added.]

The Court further held:

"The receiver, who represents the creditors as well as the stockholders of the bank, may in equity require the restoration of the fund for the benefit of the creditors."

The pleadings in the present case present a situation where the banks involved herein, as did the Central Trust Company, aided the officers and directors of Texas Mutual in creating fictitious assets in order that such officers and directors could represent to the Insurance Commissioners of Texas and other states that it had the capital and surplus required by law to do

business. The banks herein, as did the Central Trust Company, further represented to the Board, or its examiner, that such assets were the absolute assets of the Texas Mutual.

The principles laid down by the Court in Golden v. Cervenka, supra, were followed by the Supreme Court of the State of Colorado in the case of Johnson v. Elliott, 76 Colo. 358, 231 P. 675. In the Johnson case, the Centennial Mutual Insurance Company was incorporated under Colorado laws which are almost identical to those under which Texas Mutual was incorporated. In following the principles announced in the Golden case, supra, the Colorado Supreme Court said:

"Golden v. Cervenka, 287 Ill. 409, 116 N.E. 273, was a case where the court enforced the equitable principle that is enforced in the instant case. The Golden Case was not the same as this in its facts, but we think it is authority for our conclusion here. In that case the court said that one who enables a bank to evade the statute requiring the capital stock and its surplus to be paid in cash is liable to the bank's creditors.

"The Illinois statute did not permit a bank to begin business until an auditor's certificate was issued that the bank's capital and surplus had been fully paid, and it was in accordance with the plainest principle of equity, the court said, that a person who procured such a certificate to be made could not afterward be permitted to deny its truth or the truth of the representations upon which it was based, as against a subsequent creditor of the bank by reason of its falsity.

"So here, where an insurance company is not permitted to begin business until the state insurance commissioner has issued its license and that license may not be issued until the insurance company has received 200 bona fide applications for insurance on which the premiums for the first year have been paid, and that an amount equal to the premiums is held on deposit by the insurance company, one who makes the representation is liable to a policy holder who is injured thereby. That is, where, as here, the intervener, as the court and jury found, represents to the insurance commissioner that bonds and securities which she owns, are the property and assets of the insurance company, and thereby enables the insurance company to procure from the insurance commissioner

authority to transact business, may not be heard to say, as against a policy holder, who becomes such by relying upon the truth of such representations and suffers loss, that the property belongs not to the insurance company but to her."

The Receiver relies primarily upon the case of McTamany et al v. Day, 23 Idaho 95, 128 P. 563, for authority supporting the contention that the allegations of fraud against all of the defendants were wrongful acts against the corporation and the recovery for such wrongs is an asset of the corporation and upon receivership any action brought to recover such assets should be by the Receiver. We agree with the Receiver that the McTamany case supports our holding in the present case that the cause of action against all of the defendants, including the banks, belong to the Receiver. In that case, McTamany sued the directors of the State Bank of Commerce in Wallace, Idaho, for the balance of his account in the bank which had suspended business. McTamany contended under the allegations of his complaint that his was an action to recover damages because of the unlawful acts, fraud, misconduct, and neglect of the directors to do their sworn duty to the state and the depositors in the bank; that it was, in effect, a common law action to recover damages for deceit affecting the plaintiff only, and, taking that as true, the plaintiff, McTamany, had a right to maintain the cause of action. McTamany's suit was dismissed by the trial court and such action was sustained by the Supreme Court of Idaho upon the theory that the cause of action belonged to the liquidator of the bank and did not belong to the individual. The Court in holding against McTamany, said:

"The Wallace State Bank is in the hands of a receiver, and he is authorized to proceed and marshal and collect all of the assets of the bank, and distribute them prorata among the creditors or as the Court may direct."

McTamany alleged as grounds of recovery:

"(1)   the illegal payment of dividends;

"(2)   the making and publication of false reports;

"(3)   the unlawful permitting of excessive loans;

"(4)   that the plaintiff made deposits in the bank while it was insolvent under circumstances whereby the defendants could have known of the insolvency of the bank had they exercised proper diligence."

With the reference to these alleged grounds of recovery, the Court said:

"In case of a recovery on all or either of said grounds, the amount recovered is an asset of the bank, and in that case any action brought to recover the same should be by the receiver."

Undoubtedly, the result reached in the McTamany case was correct. It appears that dividends had been declared out of capital rather than surplus by the Board of Directors. By such action, the controlling stockholders certainly depleted the capital structure of the corporation and as a result thereof the corporation suffered damage.

In this regard, the Court said:

"If the bank has suffered loss on account of the directors having declared dividends contrary to the provisions of Section 2981, Rev. Codes, *or has suffered loss in consequence of the directors' fraud, gross negligence, or wilful breach of duty,* after such corporation is placed in the hands of a receiver, it is the duty of the receiver as the representative of all concerned, to proceed and collect such illegal dividends and all other claims of such corporation due said bank by contract *or caused by the fraud, gross negligence, or wilful breach of duty of the officers thereof,* so that whatever may be recovered may be properly distributed among all of the creditors of the bank as the law or court may direct." [Emphasis added.]

In connection with this action, false statements as to the banks' capital structure and surplus were circulated and published. However, the issuance of false statements seems to have been incidental to the unlawful declaration of dividends.

The McTamany case was followed with approval by the Supreme Court of the State of Missouri in the case of Kirrane v. Boone, 334 Mo. 558,66 S.W. 2d 861. Here again, a depositor brought suit in his individual right and in behalf of other depositors charging that the directors of the defunct bank had failed and omitted to discharge their duties but to the contrary permitted the cashier to make illegal loans and deplete the bank's money which resulted in insolvency. The Court held that the cause of action belonged to the receiver and not to the individual

depositor. The individual depositor could maintain such a suit only upon allegations that the receiver had wrongfully refused to act and prosecute the cause of action. This, again, was not a case where mere false statements alone were made the one and only ground of recovery on behalf of the receiver. The Court in the McTamany case, supra, recognized there was a division of authority on the question as to whether the receiver is the proper party to maintain an action of this nature. However, we believe the result of the McTamany case, as well as the other cases herein discussed, are thoroughly in accord with the weight of authority. For other cases of similar holding, see Bailey v. Mosher, 8th Cir., 63 Fed. 488; Douglass v. Dawson, 190 N.C. 458, 130 S.E. 195; Hornor v. Henning, 93 U.S. 228; 23 L. Ed. 879; Sain v. Love et al., 207 N.C. 588, 178 S.E. 98.

It is unnecessary for us to go as far in this case as the Court did in the McTamany case. The banks are estopped to deny that the funds represented as belonging to the company were the absolute property of the latter. The Receiver clearly has a cause of action for recovery of company assets alleged to have been misappropriated by the individual conspirators. We therefore do not reach the question of whether the receiver is also entitled to sue and recover for fraud on the creditors and public resulting from the publication of false statements.

■ The Court of Civil Appeals has held that since Thompson, the official examiner of the Board, did not convert or misappropriate assets of Texas Mutual, he was, therefore, not liable to Texas Mutual for the false examination report made by him concerning Texas Mutual. The Receiver complains of such holding. We sustain the Receiver.

The Receiver's pleadings allege against Thompson that as an official examiner for the Board, he knowingly and intentionally made a false examination and report of the affairs of Texas Mutual and accepted what amounted to bribes for so doing; that upon the basis of such acts, the Board was led to place its stamp of approval upon unlawful, wrongful, and fraudulent bolstering of assets by the officers of the company; that Thompson, by his acts, aided and joined in the overall conspiracy to convert and misappropriate assets of Texas Mutual and to make and use fictitiously evaluated assets of the company in the annual statements, publications in the newspapers, financial statements used to gain admittance in other states, and the financial statements issued to the public.

In view of these pleadings, together with other pleadings connecting Thompson with the alleged overall conspiracy, we hold that the Court of Civil Appeals erred in dismissing him from the suit and in affirming the trial court's action in sustaining Thompson's plea in abatement.

This disposes of all parties except Carr. As heretofore stated, the trial court, on his own motion, dismissed Carr from the suit on the ground that the pleadings were insufficient and failed to state a cause of action as to Carr. The Court of Civil Appeals has affirmed. The Receiver contends here that the pleadings allege that Carr, a nonofficial of Texas Mutual, joined and aided the officers, directors, and others in the misappropriation, conversion, dissipation and waste of Texas Mutual's assets and the fraudulent management of its affairs. We agree with the Receiver that the pleadings are sufficient to state a cause of action against Carr.

The Receiver's pleadings specifically allege against Carr that he knowingly made a false and fraudulent appraisal of Texas Mutual home office building; that by virtue of such false appraisal Carr aided in the ultimate use of such property by the company as an asset at the highly overinflated value to the extent of hundreds of thousands of dollars. It is alleged that this overinflated value was used by the Texas Mutual to present a false financial picture which in turn was used in obtaining a certificate to write nonassessable policies. It is further alleged that such overinflated value was used to show a false condition of solvency and surplus in the company's application for a license to do business in other states and in Annual Statements, newspaper publications, and the financial statements distributed to the creditors, policyholders, and the public, and that all such acts were in violation of the law.

The pleadings show that Carr, at all times involved herein, was an employee of Paul Lowry, one of the organizers of Texas Mutual, and that Carr, one of the appraisers, joined in the fraudulent appraisal of such property; that Lowry prepared a false, fraudulent and deceitful statement which set forth the appraised value as being $561,000, whereas, the reasonable market value was not in excess of $94,000. The petition alleges that after the "preparation of this false, fraudulent and misleading appraisal", Carr "signed the appraisal and embraced and adopted it as his own."

These pleadings bring Carr under the rule announced in Fountain Spring Park Co. v. Roberts, 92 Wis. 345, 66 N.W. 399.

"The principle of law that, where several persons combine to carry out a fraudulent conspiracy to cheat another, each and all of such persons are liable to the defrauded party, without reference to the amount of the fruits of the fraudulent transaction he obtains, or the degree of his activity in the scheme, is too well settled to admit of discussion, or to need any citation of authority in support of it. It is on that principle that the defendants Roberts and Russell are charged in this case, and the allegations of the complaint in that regard, as appears from the statement of facts, make out a conspiracy to defraud, entered into and carried out by all the defendants; hence all are equally liable, and the complaint states a good cause of action, as to each."

In view of the holdings herein made, we affirm the judgment of the Court of Civil Appeals reversing and remanding the cause as to Kohler. As to the First National Bank, American National Bank, Thompson and Carr, the judgments of both the trial court and the Court of Civil Appeals are reversed, and the cause is remanded to the trial court for trial in accordance with this opinion. The trial court is instructed to continue its order of severance of the Receiver's cause of action as against the banks.

Affirmed in part and reversed and remanded in part.