IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 01-10272

FLORIDA DEPARTMENT OF INSURANCE,
as receiver of Western Star Insurance Company, Ltd.,

Plaintiff-Appellant,

versus

CHASE BANK OF TEXAS NATIONAL
ASSOCIATION, formerly known as Texas
Commerce Bank National Association,
formerly known as Ameritrust of Texas
National Association,

Defendant-Appellee.

Appeals from the United States District Court for
the Northern District of Texas

November 30, 2001

Before REAVLEY, HIGGINBOTHAM and PARKER, Circuit Judges.

REAVLEY, Circuit Judge:

The Florida Department of Insurance (Florida), receiver for Western Star

Insurance Company, appeals the district court's order granting Chase Bank of

Texas's Motion for Summary Judgment, and denying Florida's Cross-Motion for

Summary Judgment. The district court dismissed Florida's claims for fraud and

breach of fiduciary duty against Chase Bank, who was trustee of a trust established to (1) allow Western Star to conduct business in California, and (2) provide assets as security for policyholders. Because Florida lacks standing to sue on behalf of the policyholders, and because it has not raised a disputed issue of material fact with respect to the claims raised on behalf of Western Star, we affirm the judgment of the district court.

BACKGROUND

The facts are largely undisputed. Western Star was an insurance company, based in Antigua, selling surplus line insurance in California. Although Western Star was not admitted as an insurance company in California, it conducted business there on the assumption that it could do so unless California regulatory authorities entered a cease and desist order against it. In November 1992, California passed a law requiring that every alien surplus line insurer establish a trust containing at least $5.4 million to create a readily available pool of assets for payment of claims. Compliant trusts were to be established by May 25, 1993.

Western Star contacted Ameritrust, whose successor in interest is Chase Bank of Texas (Chase), to establish an acceptable trust. In February 1993, Western Star and Chase executed a trust instrument largely patterned on the NAIC (National

2

Association of Insurance Commissioners) standard trust instrument, approved by California regulators. The trust agreement provided that Western Star "desires to establish a trust fund in the United States as security for said Policyholders and Third Party Claimants and to qualify as an eligible or approved surplus lines insurer therein." As the trust settlor, Western Star funded the trust on March 10, 1993 with a certificate of deposit issued by First Asia Development Bank, which had a face value of $5.4 million.

Almost immediately, Chase sent a letter to insurance brokers in California informing them that Western Star had established a trust account at Chase worth $5.4 million. On March 18, 1993, Western Star's sponsoring broker in California repeated this information in a notice to "All Brokers." Beginning in April, Western Star sold thousands of insurance policies in California.

In May 1993, the California Department of Insurance asked Western Star and Chase for additional information about the trust agreement and the First Asia certificate of deposit. Chase responded with a "certification" to the Department that the trust assets had a market value of $5.4 million; this document may have been filed with the California Department of Insurance as part of Western Star's Surplus Line Insurance application package around May 21, 1993. For reasons that are not clear from the record, the initial application was rejected, but Western Star refiled

the application on June 1, 1993.  The Department of Insurance continued to find the CD suspicious and, on June 15, 1993, denied the application and ordered brokers to cease and desist selling Western Star policies in California.

California was rightly suspicious; the CD was worthless.  Issued by First Asia Development Bank, an unregulated bank from the South Pacific Republic of Vanuatu,[1] the CD stated, "Ameritrust Texas National Association [Chase], as Trustee for Western Star Insurance, Ltd., Antigua has lodged a deposit in the amount of United States Dollars Five Million and Four Hundred Thousand only."[2]  In fact, neither Western Star nor Chase had deposited any money with First Asia Development Bank.  Instead, Western Star was "renting" the CD from Europe-America Capital Corporation, in what is euphemistically described as a "credit enhancement" transaction.  The CD could not be drawn on by the holder.[3]

In 1994, unpaid insurance claims against Western Star were mounting.  A Florida state court placed Western Star into receivership, and appointed the Florida Insurance Commissioner as the domiciliary receiver and the California Insurance

---

[1] The Republic of Vanuatu is located between Australia and Fiji.

[2] Chase concedes that Ameritrust itself was not the depositor with First Asia, but contends it thought the CD wording was designed only to make the CD payable to Ameritrust rather than Western Star.

[3] First Asia canceled the CD prior to the commencement of receivership proceedings. First Asia has since vanished from Vanuatu.

4

Commissioner as ancillary receiver. The Western Star receivership estate does not have sufficient assets to pay policyholder claims, and may not even have enough money to pay all of the Florida receiver's administrative costs.

During preliminary litigation, a district court in the Northern District of Texas discharged Chase from any further obligations as trustee when Chase tendered the CD into the court registry. The discharge order did not, however, determine the value of the trust assets, or consider liability Chase might have incurred for conduct relating to its duties as trustee.[4] Florida originally filed the instant suit against Chase in Florida state court, but that case was dismissed for lack of personal jurisdiction. Florida subsequently brought this action against Chase in the Northern District of Texas. Although the California Insurance Commissioner has filed an amicus brief in this appeal, it is not a plaintiff in the present suit against Chase, nor is any individual policyholder a party to this action.

DISCUSSION

Summary judgment is reviewed de novo,[5] and is appropriate when, viewing

_____

[4] See Texas Commerce Bank Nat'l Ass'n v. Florida, 138 F.3d 179, 181-82 (5th Cir. 1998).

[5] Maher v. Strachan Shipping Co., 68 F.3d 951, 954 (5th Cir. 1995).

the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law.[6] After a defendant properly moves for summary judgment, the non-movant plaintiff must bring forward sufficient evidence to demonstrate that a genuine issue of material fact exists on every element of a claim.[7]

Difficulties in this case arise in part because the briefing does not clearly distinguish between the various theories of liability by identifying to whom a duty was breached and the proper measure of damages with respect to each claim. Some of Florida's theories rely on breaches of duty to the policyholders, while others rely on breaches of fiduciary and trust duties by Chase to Western Star directly. Disentangling the various theories of liability is crucial to determining whether the elements of each have been properly identified, and whether the record reveals a disputed issue of material fact on every required element.

*A.*     *Policyholder Claims and Florida's Standing*

At the 12(b)(6) Motion to Dismiss stage of this case, the district court denied Chase's motion to dismiss Florida's claims on behalf of the policyholders for lack of

---

[6]  See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

[7] Fontenot v. Upjohn Co., 780 F.2d 1190, 1196 (5th Cir. 1986).

standing. Although the parties have not briefed the standing issues as part of this

appeal, standing is a component of Article III's case or controversy requirement,

and is jurisdictional in nature.[8] Standing must exist for a suit to proceed:

> In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a "case or controversy" between himself and the defendant . . . . As an aspect of justiciability, the standing question is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.[9]

As articulated by the Supreme Court in Lujan v. Defenders of Wildlife,[10] the

elements of constitutional standing are: (1) that the plaintiff have suffered an "injury

in fact–an invasion of a legally protected interest which is (a) concrete and

particularized, and (b) actual or imminent"; (2) that there is "a causal connection

between the injury and the conduct complained of"; and (3) that the injury is likely

to be redressed by a favorable decision.[11] Under Lujan, courts must carefully

examine whose injury is at issue, and to whom the recovery will go. If the plaintiff

is not the party who sustained the concrete and particularized injury for which a

---

[8] Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 475-76, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982).

[9] Warth v. Seldin, 422 U.S. 490, 498-99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (emphasis in original).

[10] 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

[11] Id. at 560-61, 112 S.Ct. at 2136 (citations omitted).

7

remedy is sought, and is not the assignee or designated representative of the injured party,[12] then it does not have standing. "The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally."[13]

In Caplin v. Marine Midland Grace Trust Co. of New York,[14] a case similar in many respects to the present one, the Supreme Court held that a trustee in bankruptcy did not have standing to bring claims against a third party on behalf of creditors of the insolvent corporation. In Caplin, a company called Webb & Knapp issued debentures worth $8,600,000 and pledged to limit its debt-equity ratio, which would be certified by an annual report to Marine Midland Trust. Subsequently, Webb & Knapp's debt sky-rocketed, but Marine failed to report inflated appraisals of the value of Webb's assets. When Webb entered bankruptcy, the trustee in bankruptcy sued Marine on behalf of the debenture holders, "seeking to recover the

---

[12] Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 773-74, 120 S.Ct.1858, 1863, 146 L.Ed.2d 836 (2000) (holding that a qui tam relator under the False Claims Act is a combination agent and assignee of the United States' claims, who has "representational standing" to sue for the government).

[13] Warth, 422 U.S. at 499, 95 S.Ct. 2197; see also Valley Forge, 454 U.S. at 473, 102 S.Ct. 752 ("The federal courts have abjured appeals to their authority which would convert the judicial process into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.'") (quoting United States v. SCRAP, 412 U.S. 669, 687, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)).

[14] 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972).

8

principal amount of the outstanding debentures as damages for Marine's alleged bad-faith failure to compel compliance with the terms of the indenture."[15]

The Supreme Court held that the trustee lacked standing to bring the action against Marine on behalf of the debenture holders. First, the Court focused on the statutory power accorded the bankruptcy trustee to sue on behalf of third parties; the Court found no suggestion in the language of the Bankruptcy Code that a bankruptcy trustee was to have such a responsibility.[16] Instead, the Court reiterated that a trustee in bankruptcy stands in the shoes of an insolvent corporation, and emphasized the distinction between suits on behalf of the corporation and third parties.[17]

Second, the Court was concerned that, as a practical matter, a recovery by the trustee on behalf of the debenture holders would not really add to the assets of the estate.[18] If, as appeared to be the case, Webb & Knapp was *in pari delicto* with Marine Trust, Marine Trust could turn right around and assert a claim against Webb & Knapp in subrogation to the claims of the policyholders to apportion the loss

---

[15] Id. at 420, 92 S.Ct. at 1681.

[16] Id. at 428, 92 S.Ct. at 1685.

[17] Id. at 429, 92 S.Ct. at 1685 (citing McCandless v. Furlaud, 296 U.S. 140 (1935)).

[18] Id. at 429-30, 92 S.Ct. at 1686.

9

between them.[19]  And apart from the potential problem of subrogation, a suit by the trustee to recover for the debenture holders would significantly complicate the process of establishing damages:

> Each creditor, including the debenture-holders, can prove the full amount of his claim, and only to the extent that a debenture-holder fails to satisfy it from the bankruptcy estate will he suffer a loss which he can assert against the defendant through its failure to enforce the negative convenants.[20]

In other words, a suit by the trustee on the debenture holders' behalf put the cart before the horse; the trustee could not measure damages suffered by the debenture holders until those creditors had brought their claims against the estate, and the shortfall in available estate assets to pay those claims became clear. [21]

Third, the Court found problematic the possibility that a suit by the trustee would conflict with independent actions the debenture holders might want to bring on their own behalf, and might not bind third-party claimants seeking to proceed separately.[22]  Conflicts could arise between the trustee and the debenture holders if the trustee chose to settle for less than what holders thought their claims were

---

[19] Id. at 430, 92 S.Ct. at 1686.

[20] Id. at 431, 92 S.Ct. at 1686 (quoting Clarke v. Chase Nat'l Bank, 137 F.2d 797, 800 (2d Cir. 1943)).

[21] While the Caplin Court did not distinguish between "prudential" and "constitutional" standing considerations, complications in measuring damages appear to be prudential concerns.

[22] Id. at 431-32, 92 S.Ct. at 1686.

10

worth, or if the debenture holders began to inexpensively settle their individual claims out of court, thus undercutting the trustee-led action. The Court found that, unlike the Federal Rule governing class actions, the Bankruptcy Code was not designed to handle such problems.[23] Conflict of interest problems are not merely prudential, but directly relate to Article III standing principles, which "reflect[] a due regard for the autonomy of those persons likely to be most directly affected by a judicial order."[24]

In the present case, the Florida liquidator seeks to recover $5.4 million or other damages from Chase on a variety of theories. Among these theories are the claims that Chase defrauded individual policyholders by representing that Western Star had a $5.4 million CD on deposit with Chase, and breached fiduciary duties to the policyholders. The breaches of duty under these theories were to policyholders, not Western Star. The policyholders experienced injury because they were tricked into buying insurance policies from an insolvent company that is now unable to pay insurance claims, or because Chase, as trustee, mishandled trust assets or breached

---

[23] Id. at 433-34, 92 S.Ct. at 1688.

[24] Valley Forge, 454 U.S. at 473, 102 S.Ct. at 759; see also Fleming v. Lind-Waldock & Co., 922 F.2d 20, 25 (1st Cir. 1990) (holding that an equity receiver of an investment company lacked standing to bring claims on behalf of third parties, in part because of conflicts that could arise).

other duties it owed as trustee.[25]  The Florida Insurance Commissioner, as receiver for the Western Star estate, does not have standing in federal court to bring these claims on behalf of policyholders.

If recovery is sought for injury suffered by individual policyholders, the Florida receiver has standing in federal court only if it is a representative of the injured policyholders.  In the present case, there are no facts to support any recognized theory of representation.  There is no indication in the record that the policyholders have assigned their fraud claims to Western Star or the Florida receiver.  Similarly, there is no evidence that policyholders have designated the Florida receiver as their agent.

Furthermore, as in Caplin, which dealt with the Bankruptcy Code, the relevant statute in this case, Florida's Insurer Rehabilitation and Liquidation Act, does not designate the Florida receiver as any third party's representative.  The insurance liquidation acts of some states do expressly authorize insurance receivers to take up certain policyholder claims, or have been interpreted by state courts to

---

[25] Whether Western Star alone, or both the policyholders and Western Star are the beneficiaries of the trust is an issue neither party has briefed.  Florida does not have standing to raise individual policyholder claims for breach of trust or fiduciary duty.  Whether Chase breached trust or fiduciary duties to Western Star is discussed below.

allow such action.[26]  However, Florida's statute provides only that "an order to liquidate the business of a domestic insurer shall direct the department forthwith to take immediate possession of the *property of the insurer*, to marshal all the *assets of the insurer* . . . and to give notice to all creditors who may have claims against the insurer to present such claims. . . ."[27]  A fraud or breach of trust action accruing to a policyholder cannot be described as "property" or an "asset" of Western Star.

Florida courts have not interpreted the insurance receivership laws as authorizing receivers to act in a representative capacity on behalf of anyone other than the insolvent insurer.  One Florida court has held that as a successor in interest of the insolvent insurer, an insurance receiver may only bring causes of action that the insurer could have brought.[28]  The Florida Supreme Court has explained in the

---

[26] See, e.g., Four Star Ins. Agency, Inc. v. Hawaiian Elec. Indus., Inc. 974 P.2d 1017, 1022 (Hi. 1999); Arthur Andersen LLP v. Superior Court, 67 Cal. App. 4th 1481, 1487 n.3, 1495, 79 Cal. Rptr. 2d 879 (Cal. Ct. App. 1998) (defining auditor's incorrect valuation as breach of duty to insurance commissioner, who could recover damages sustained by policyholders for their benefit); Merin v. Yegen Holdings Corp., 573 A.2d 928, 940 (N.J. Super. Ct. App. Div. 1990) (holding that under New Jersey law, the liquidator could conduct a "class action type" proceeding on behalf of policyholders claiming fraud against the insurer's auditor).  The Court notes that the majority of cases allowing a receiver to proceed on behalf of third parties are state court cases.  Article III's "case or controversy" limitation is not binding on state courts.

[27] FLA. STAT. ANN. § 631.111(1) (1996) (emphasis added).

[28] Florida Dep't of Ins. v. Blackburn, 633 So. 2d 521, 524 (Fla. Dist. Ct. App. 1994) ("As a successor, the receiver can only bring causes of action that were possessed by the corporation placed in receivership."); see also Schacht v. Brown, 711 F.2d 1343, 1346 n.3 (7th Cir. 1983) (casting doubt in dicta on a receiver's standing to bring suit on behalf of third parties under a similar Illinois statute).

context of equitable receiverships, "'a receiver takes the rights, causes and remedies which were in the corporation, individual or estate whose receiver he is, or which were available to those whose interests he was appointed to represent. A receiver has no right to property which does not belong to the individual or corporation over which he was appointed.'"[29] Assuming that Florida *could* designate its Insurance Commissioner as the automatic representative of policyholders in the prosecution of their fraud and breach of trust claims, it has not evidenced an intent to do so.[30]

Policy considerations of the sort at issue in Caplin lend further support to the above interpretation of Florida's Insurance Liquidation Statute.[31] In Caplin, the Court noted the likelihood of conflicts of interest between the trustee in bankruptcy and the debenture holders. In the present case, such conflicts are unlikely to emerge if, as the parties state, the California policyholders have already missed their window under the statute of limitations to sue on their own. However, an interpretation of Florida law as authorizing receiver suits on behalf of third parties

---

[29]  Hamilton v. Flowers, 183 So. 811, 817 (Fla. 1938) (quoting 53 C.J. 99, 324).

[30] Where a receiver has effectively appropriated policyholder claims, and any recovery is applied in part to the estate's administrative claims, due process might well be implicated.

[31] If the Florida courts were, on similar facts, to read the Florida statute as authorizing the type of representational standing the Receiver seeks to exercise in this case, the policy considerations in Caplin might nevertheless provide a prudential basis for rejecting Receiver standing to assert policyholder claims in federal court.

14

might apply equally to future cases in which individual policyholders might want to act autonomously, and in which legal and strategic preferences of policyholders and the receiver diverge.

Also, as in Caplin, unless and until individual policyholders have established the amount of money that they are owed for insurance claims by bringing claims against the receivership and the amount of the shortfall is established, it is unclear how a fraud or breach of fiduciary duty suit against Chase on behalf of the policyholders could establish policyholder damages. Indeed, the Florida receiver overtly endorses a "pay first, establish damages later" approach, demanding $5.4 million from Chase up front, to be used for any and all purposes under the Liquidation Act priority scheme, including payment of administrative claims first.[32] Not only might a flat $5.4 million recovery be incommensurate with actual damages, but conceivably any such recovery could go entirely to the cost of estate administration, with little remaining to compensate injuries suffered by those on whose behalf these claims are ostensibly brought.

---

[32]Florida's Insurer Insolvency, Rehabilitation and Liquidation Act establishes a priority scheme for payment of claims, similar to the Bankruptcy Code. All claims in one class must be paid before any claims lower in the priority line. If insufficient funds exist to pay a class in full, a pro rata distribution is made. In order of priority, the classes include: (1) administrative claims; (2) losses covered by insurance policies; (3) premium refunds; (4) federal government claims; (5) debts to insurance company employees; (6) general creditors. FLA. STAT. ANN. § 631.271 (1996).

Florida lacks direct standing to bring claims to recover for injuries that are not its own or Western Star's, and does not have representational standing to proceed on behalf of the policyholders.

B.    *Western Star's Claims*

If the receiver may not assert the individual claims of the policyholders, then it may proceed to trial only on causes of action resting on breaches of duty to Western Star itself.  The receiver has asserted several claims of this sort.  The question is under what theory, if any, and to what extent, Western Star's estate may recover from Chase for its acceptance of Western Star's dummy CD.  Though Florida has standing to assert these claims, the district court properly granted summary judgment on them.

1.    Loss of Trust Assets

Florida alleges that Chase wrongfully lost $5.4 million of trust assets and that it is, as trustee, subject to the remedy of restoring the lost assets, both at common law and under the terms of the trust agreement.  Under this theory, Chase is liable for $5.4 million, the amount of the loss.  This theory is not grounded in reality.  Florida demands that Chase hand over $5.4 million in cash instead of the worthless piece of paper that Western Star used to settle the trust.  There never was $5.4 million, except, perhaps, in the mind's eye of some creative bankers.  As the district

16

court observed, the start and end value of the trust was $0.00.

Similarly, Florida's heavy emphasis on paragraph 4.4 of the trust agreement, which provides that the Trustee must, in the event of insolvency, transfer all trust assets to the receiver, is misplaced. The district court correctly noted that paragraph 4.4 is a turnover provision, not a liquidated damages provision. Chase has already turned over the CD, which was the sole, worthless asset held "in trust." These observations do not necessarily excuse Chase from wrongdoing; rather, they simply illustrate that "loss of trust assets" and failure to comply with the trust agreement's turnover provision are not useful ways to conceptualize the wrong.

In its reply brief, Florida argues for the first time in this appeal that Chase is estopped from denying that it held assets worth $5.4 million. Under Texas law, "[e]stoppel involves the reasonable reliance of one party on the conduct or statements of another party. If the relying party suffers harm as a result of its reliance, the law estops the other party from disavowing its earlier conduct or statements."[33] Florida's argument appears to be that Chase is estopped, in defending against Florida's causes of action, from making the factually correct statement that the $5.4 million never existed. Whatever Florida's estoppel position

---

[33] Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co., 174 F.3d 653, 660 (5th Cir. 1999).

17

is, Florida's own summary judgment brief noted, "a party invoking estoppel must be ignorant of the facts which the party to be estopped is alleged to have represented by his conduct or silence."[34] Florida has never responded to Chase's argument that Western Star knew full well that the CD was worthless, and so could not have relied on any representations Chase made to the contrary.[35]

2.    Improper Certification of Trust Assets

Florida argues that Chase breached a duty to Western Star by not compelling it to place assets valued at the trust fund minimum into the account. Florida states, "[d]uring the entire time, the Trustee never rejected the CD or valued the Trust at less than $5.4 million. Consequently, the Trustee never demanded other collateral. The Trustee never should have executed the Trust Agreement and promulgated the express representation of value as $5.4 million until after it had received and accepted qualified assets." This argument fails for two reasons.

First, in a deviation from standard NAIC trust language, the terms of the trust

---

[34] Meyers v. Moody, 693 F.2d 1196, 1208 (5th Cir. 1982) (citations omitted).

[35] Wheeler v. American Nat'l Bank of Beaumont, 347 S.W.2d 918 (Tex. 1961), cited by Florida in its reply brief, is distinguishable. In that case, the receiver sued officers and employees of the insolvent insurer together with banks who had misrepresented the value of the loans. Id. at 919. The receiver thus placed all wrongdoing on parties other than the insurance company, on whose behalf the receiver was suing. In contrast, Florida has not explained why knowledge of the fraudulent CD valuation should not be imputed to Western Star itself. Florida's Complaint describes conduct perpetrated by "Western Star," thus eliminating any possibility of reliance.

18

agreement provide that Chase did not have a duty to certify the value of the trust assets to the National Association of Insurer Information Office. Paragraph 2.13 of the agreement between them provided that "the Trustee shall be under no duty or obligation to require the Company to make any transfers or payments of additional assets to the Trust and it shall be conclusively presumed that any and all such transfers or payments to Trustee have been properly made." Under Texas law, the settlor of a trust "may relieve the trustee of a duty, liability, or restriction imposed by this subtitle,"[36] and the parties agreed in the trust instrument that Chase would have no duties or responsibilities not expressly provided for in the trust language. Accordingly, Chase did not have a duty to compel Western Star to deposit additional assets.

Second, Florida has not supplied a valid measure of damages under its "breach of duty to value assets" theory. Even if Chase did have a duty to Western Star to value assets, Florida assumes, without any explanation, that the measure of damages is $5.4 million. There is no reason that $5.4 million, an amount of money that never existed except in ink on the face of a piece of paper, bears any connection to anyone's actual damages.

The measure of damages under this theory is at best the amount of money

_____

[36] TEX. PROP. CODE § 113.059.

19

Chase could have successfully compelled Western Star to place into the trust for the benefit of Western Star and its estate in the event of insolvency. Western Star was already insolvent in 1993 when the trust was established, and at all times thereafter. As the Fifth Circuit has previously held, "a 'trustee is not liable for a loss resulting from the breach of trust if the same loss would have been incurred if he had committed no breach of trust.'"[37]

There is no evidence that Western Star ever had any net assets it could have used to fund the trust. Florida argues that because Western Star took in upwards of $6 million in premium payments after the trust was established, Chase could have compelled payment of the $5.4 million. Evidence of income in the form of premium payments does not establish the amount of assets that Western Star had available at any given time.

3.    Misrepresentation/Fraud

The district court properly granted summary judgment against Florida's claim that Western Star itself had been the victim of Chase's fraud or misrepresentation.

---

[37] Whitfield v. Lindemann, 853 F.2d 1298, 1304 (5th Cir. 1988) (quoting RESTATEMENT (SECOND) OF TRUSTS § 212 cmt. e, in the context of ERISA trust law); see also Craft v. Sunwest Bank of Albuquerque, 84 F.Supp.2d 1226,1240-41 (D.N.M. 1999) (suggesting in dicta that a trustee who fails to compel the settlor to deposit sufficient assets into a trust cannot be liable for more than the assets that would have been available to fund the trust).

Under Texas law, reliance is an element of fraud or misrepresentation,[38] and Florida concedes that Western Star did not rely on Chase's representation that the CD was worth $5.4 million. Florida's opening brief on appeal does not explicitly identify fraud on Western Star (as opposed to the policyholders) as an issue on appeal, although there is scattered language suggesting an attempt to pursue this theory. However, Florida has not raised any argument as to how it might bring a fraud action for injury inflicted on Western Star without proving reliance.[39] Florida's reliance arguments relate to fraud claims brought on behalf of the policyholders, not Western Star.

4. Deepening Insolvency

Florida argues that by certifying the trust assets at $5.4 million, Chase caused the life of Western Star to be artificially prolonged, causing it fall deeper into debt as it issued more policies on which it could not pay claims. Florida says, "if the Trustee had not executed the Trust Agreement to enable Western Star to market

---

[38] F.D.I.C. v. Patel, 46 F.3d 482, 486-87 (5th Cir. 1995) (citing Sears Roebuck & Co. v. Meadows, 877 S.W.2d 281, 282 (Tex. 1994)).

[39] Florida does not argue, for example, that Western Star could have pursued a fraud claim against Chase because the knowledge of its officers and directors should not be imputed to the corporate entity itself, F.D.I.C. v. Ernst & Young, 967 F.2d 166, 170-71 (5th Cir. 1992)("In Texas, whether an employee's fraud is attributable to a corporation depends on whether the fraud was on behalf of the corporation or against it. . . ."), or that any such imputed knowledge should not carry over to the receiver asserting claims on behalf of the estate. See F.D.I.C. v. O'Melveny & Myers, 61 F.3d 17, 19 (9th Cir. 1995).

21

policies in California, there would not have been millions collected in premiums and millions owed on claims and, of course, no lawsuit by the Receiver on the Trust."

There is a trend toward recognizing "deepening insolvency" as a cause of action against a party who creates the false appearance of solvency in an insurance company or other financial institution.[40] As a result of this deception, regulatory authorities allow the company to keep operating, and do not place it into receivership in a timely fashion. Damages are measured by the dissipation of assets or increased debt load occurring after the false representation of solvency was made. Some courts have suggested that the receiver may only bring such an action on behalf of the insolvent company when individual officers of the insolvent company engaged in such activity with an outside party to keep the business open for the purposes of looting its assets, rather than benefitting the company.[41]

In any event, Florida does not point to any caselaw in support of this theory, and mentions it only in passing. There do not appear to be any reported Texas cases recognizing "deepening insolvency." Ultimately, the Court need not decide whether

---

[40] Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 2001 WL 1188245 *6-8 (3d Cir. Oct. 9, 2001) (holding that Pennsylvania's Supreme Court would recognize a "deepening insolvency" cause of action); see also Corcoran v. Frank B. Hall & Co., Inc., 149 A.D.2d 165, 175-76 (N.Y. App. Div. 1st Dep't 1989).

[41] See Schacht, 711 F.2d at 1350; see also In re Latin Inv. Corp., 168 B.R. 1, 5 (Bankr. D.C. 1993) (discussing a bankruptcy trustee's standing to sue a third party who worked with insolvent company's principals in misusing corporate funds).

the Texas Supreme Court would recognize this theory as an independent cause of action. Even if it would, Florida has made no attempt, either in its summary judgment briefing and evidence in the district court, or in its brief on appeal, to quantify how much additional debt, if any, Western Star incurred after Chase assisted in establishing the empty trust. To the extent that Florida has adequately briefed deepening insolvency as a viable legal theory, there is no evidence of damages measured from the "deepening insolvency" perspective that would justify allowing Florida to proceed to trial on this claim.

Finally, the Court addresses the concern of both the Florida receiver and the District Court that "[m]any wrongs but no rights is not the hallmark of either Texas or Florida jurisprudence." Our holding today does not demonstrate the absence of a remedy in this type of case. Without expressing an opinion on the merits of any particular option, policyholders might bring a class action to attempt fraud or breach of fiduciary duty claims against a NAIC trustee; the California Insurance Commissioner, who the California Supreme Court has held to be a representative of California policyholders,[42] might bring such claims on their behalf; a receiver in Florida's position might prevail on a deepening insolvency theory or recover from officers and directors of the insurance company; or an insurance commissioner

---

[42] See Arthur Andersen, 67 Cal. App. 4th at 1495, 79 Cal. Rptr. 2d 879.

might sue the trustee for contribution if the insurance company and trustee acted as joint tortfeasors and applicable state law allows. In the present case, however, the correct combination of legal theories, proper plaintiffs, and evidence on damages is not present.

CONCLUSION

Western Star was not the victim of any tort for which it has both identified a duty that was breached, and supplied adequate summary judgment evidence on the existence of damages. With respect to injuries sustained by the policyholders, neither Western Star nor the Florida receiver is an assignee of policyholder claims, or an agent to represent their interests. To the extent that Florida *could* statutorily designate its insurance commissioner as an agent of California policyholders to prosecute claims on their behalf, it has not evidenced an intent to do so. The Florida receiver lacks standing in federal court to bring claims predicated on a breach of duty and injury to the policyholders.

AFFIRMED.