LARRY A. JONES, SR., J.:
*336 {¶ 1} Plaintiff-appellant Lewis Merletti ("Merletti") appeals from the trial court's August 1, 2017 decision granting summary judgment in favor of defendants-appellees Jeremy Samide ("Samide") and Ann Katigbak ("Katigbak"). For the reasons that follow, we affirm.
I. Factual and Procedural Background
{¶ 2} Samide and Katigbak, along with nonparties Don Heestand ("Heestand") and Brian McCune, founded defendant-appellee E-Merging Technologies Group, Inc. ("ETG" or "the company"). Pursuant to a January 1, 2001 shareholder agreement, Heestand was the chief executive officer and owned 85 shares of the company's stock; Samide was the treasurer and owned five shares; and Katigbak was the secretary and owned five shares. McCune owned the remaining five shares of the company's stock. Heestand, Samide, and Katigbak were primarily responsible for the day-to-day operations of the company.
{¶ 3} In 2007, Heestand recruited Merletti to sit on ETG's senior advisory board and Merletti agreed. Heestand gifted Merletti ten shares of the company's stock in exchange for his participation. Merletti thereby became an ETG minority shareholder and advisory board member; it is undisputed that Merletti was never an ETG employee. According to Merletti, Heestand told him that his shares in the company would one day make him a millionaire.
{¶ 4} In June 2008, Heestand passed away. At the time of Heestand's passing, ETG was a multimillion dollar company. After Heestand's death, Samide and Katigbak took control of the company and, according to Merletti, did so in a manner to benefit themselves and to the detriment of the shareholders. For example, Merletti detailed "dramatic pay increases [Samide and Katigbak took] without any notice to or approval by the other shareholders."
{¶ 5} In March 2009, a meeting was held to nominate and appoint a board of directors for the company. As a result of the meeting, seven people were appointed: Samide, Katigbak, Merletti, Charles Painter, Thomas Kasza, Michael Dobeck, and Jacquelyn Huron.
{¶ 6} In July 2009, Merletti was appointed as chairman of the board of directors, and was compensated for his services in that position. He was also provided a commission for any business that he helped the company develop. However, Merletti never received a salary or other employment-related compensation from ETG.
{¶ 7} As a result of Heestand's passing, Samide was promoted to the position of chief executive officer, and he and the company executed an employment agreement. Katigbak also executed a similar employment agreement with the company.
{¶ 8} Merlettti contends that the agreements were "surreptitiously" executed without board approval, and provided "exorbitant" compensation and "significant fringe benefits" for Samide and Katigbak. The agreements included provisions that if Samide or Katigbak were terminated or had their salaries reduced, they were entitled to have ETG repurchase their shares of stock. Additionally, after Heestand's passing, the company, as required by the shareholder agreement, entered into an agreement with Heestand's estate to purchase his shares in the company.
{¶ 9} After this reorganization in the company, Samide and Katigbak each owned 20 shares in ETG; Merletti retained *337 his original ten shares; and other employees/directors owned the remaining shares.
{¶ 10} Further, because a number of the company's shareholders were directors but not employees of the company (including Merletti), the shareholders executed a first amendment to the 2001 shareholder agreement. Pursuant to the amendment, the company had the right, in its sole discretion, to purchase a director's shares in ETG upon the director's termination or resignation from service to the company in the same manner that the company could elect to purchase the shares of employees who resigned or were terminated from the company. The amended agreement provided that
[f]or purposes of the [shareholder agreement], a member of the Board of Directors of [the] Company shall be considered an employee and removal or resignation shall be considered a right for the Company to purchase the Director's shares at Book Value pursuant to Section 4 of the [shareholder agreement].[1]
{¶ 11} The record demonstrates that the company's financial outlook declined after Heestand's death. The board secured an outside accounting firm to conduct a forensic audit of the company for the year 2011. The audit revealed an unexplained increase of over $975,500 from 2010 to 2011 in "general and administrative" expenses.
{¶ 12} In August 2012, a board meeting was held, and the results of the audit were reviewed. According to Merletti, the unexplained increase was not properly accounted for. The board decided that it was going to conduct another audit for the years 2010-2012. Merletti sought to obtain documents relative to ETG, including financial documents. The company, through Katigbak, refused to provide Merletti with any financial documents.
{¶ 13} After Merletti raised his concerns, Samide scheduled a "special" shareholder meeting for September 7, 2012. The purpose of the meeting was to fix the number of board members to three and elect those members. During his deposition, Samide testified that he felt this was necessary because Merletti and some of the other board members had become "adversarial" toward him, and he felt that reducing the board to three members would help protect himself, his family, and ETG. Believing that his removal from the board was certain, Merletti resigned.
{¶ 14} After Merletti's resignation, the company provided Merletti notice of its intention to purchase his shares at book value as provided under the shareholder agreement and the first amendment to the agreement. In October 2012, the company informed Merletti that his shares in ETG had a negative book value and, thus, the company had no obligation to pay him for the shares.
{¶ 15} In November 2012, Merletti initiated this action against ETG, Samide, and Katigbak seeking (1) a declaratory judgment regarding the "appropriate method for calculating the value of [his] shares" due to his resignation from the board (Count 1); (2) specific performance of the shareholder agreement to value his shares at the fair market value (Count 2); and (3) production of the company's financial documents (Count 3). Merletti also asserted claims against the defendants for breach of fiduciary duty (Count 4) and fraud (Count 5).
{¶ 16} ETG, Samide, and Katigbak counterclaimed against Merletti for breach of contract, breach of fiduciary duty, tortious interference with business relations, *338 and unjust enrichment. The defendants also filed a Civ.R. 12(B)(6) motion to dismiss Merletti's complaint. The trial court granted the motion to dismiss as it related to Counts 1, 2, and 3 of Merletti's complaint.
{¶ 17} The case proceeded through discovery, and in June 2015, while the case was still pending, ETG filed a voluntary petition for bankruptcy under Chapter 7 of the United States Bankruptcy Code. Despite the bankruptcy filing, the case remained active on the common pleas docket, and Samide and Katigbak filed motions for summary judgment.
{¶ 18} As a result of proceedings in the bankruptcy court, Merletti dismissed his claims against ETG and ETG dismissed its counterclaims against Merletti. Thus, Merletti's remaining claims were against Samide and Katigbak for breach of fiduciary duty and fraud.
{¶ 19} In August 2017, the trial court rendered its decision on Samide's and Katigbak's motions for summary judgment. The court found that it was "constrained by the bankruptcy proceeding of [ETG] from allowing [Merletti] to proceed forward with his remaining claims in the matter." The trial court therefore granted summary judgment in favor of Samide and Katigbak and against Merletti. Merletti now appeals, contending the following in his sole assignment of error:
The trial court erred by granting summary judgment in favor of Defendant-Appellees Jeremy Samide and Ann Katigbak based upon a finding that Plaintiff-Appellant Lewis Merletti's claims against Mr. Samide and Ms. Katigbak personally were derivative, became the property of the bankruptcy estate for the company in which he, Mr. Samide, and Ms. Katigbak were shareholders, and were resolved in the bankruptcy proceedings.
{¶ 20} Additional facts will be discussed below.
II. Law and Analysis
Summary Judgment Standard
{¶ 21} Appellate review of a summary judgment ruling is de novo. Coventry Twp. v. Ecker , 101 Ohio App.3d 38, 41, 654 N.E.2d 1327 (9th Dist.1995) ; Koos v. Cent. Ohio Cellular, Inc. , 94 Ohio App.3d 579, 588, 641 N.E.2d 265 (8th Dist.1994). Summary judgment is appropriate only when the moving party demonstrates (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in its favor. Civ.R. 56(C) ; State ex rel. Grady v. State Emp. Relations Bd. , 78 Ohio St.3d 181, 183, 677 N.E.2d 343 (1997).
{¶ 22} Pursuant to Civ.R. 56(C), the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record demonstrating the absence of a material fact. Dresher v. Burt , 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). However, the moving party cannot discharge its initial burden under this rule with a conclusory assertion that the nonmoving party has no evidence to prove its case; the moving party must specifically point to evidence of the type listed in Civ.R. 56(C) affirmatively demonstrating that the nonmoving party has no evidence to support the nonmoving party's claims. Id. ; Vahila v. Hall , 77 Ohio St.3d 421, 429, 674 N.E.2d 1164 (1997).
{¶ 23} Once the moving party discharges its initial burden, summary judgment is appropriate if the nonmoving party *339 does not respond, by affidavit or as otherwise provided in Civ.R. 56, with specific facts showing that a genuine issue exists for trial. Dresher at id. ; Vahila at 430, 674 N.E.2d 1164 ; Civ.R. 56(E).
Crosby v. Beam , 47 Ohio St.3d 105, 548 N.E.2d 217 (1989)
{¶ 24} The issue to be resolved in this case is whether Merletti's breach of fiduciary duty and fraud claims against Samide and Katigbak were permissible as direct claims against them, or whether they were exclusively the property of ETG's bankruptcy estate. Merletti relies on Crosby for his contention that, as a minority shareholder of ETG, a closely held corporation, he was permitted to file a direct action against Samide and Katigbak for the alleged individual harm they caused him. He is correct that Crosby stands for that proposition.
{¶ 25} In Crosby , Howard Crosby was a minority shareholder in Seascape Building Company, Inc. ("Seascape"). Crosby transferred all of his Seascape stock to Christian Caring Center, The Church of Holy Light ("the church"). A few months after Crosby's transfer of his Seascape stock, Seascape was voluntarily dissolved. As a result of its dissolution, all of its corporate assets were transferred to the Crosby Properties Liquidating Trust ("the trust"). Each shareholder of Seascape became a beneficiary of the trust in the percentage equaling his or her interest in Seascape.
{¶ 26} Two couples were the controlling shareholders and officers and directors of Seascape. Crosby and the church brought an action against the couples, contending that they improperly expended corporate funds by, for example, paying themselves unreasonable salaries and using Seascape funds for their personal benefit.
{¶ 27} The defendants sought dismissal of the action under Civ.R. 12(B)(6) on the ground that the plaintiffs' action could only be maintained as a shareholder derivative action under Civ.R. 23.1. According to the defendants, the alleged misappropriation of corporate funds directly affected the corporation and only indirectly harmed Crosby and the church and, therefore, Crosby and the church could not maintain their case as a direct action.
{¶ 28} The Ohio Supreme Court, recognizing the nature of a closely held corporation,[2] held that
if we require a minority shareholder in a close corporation, who alleges that the majority shareholders breached their fiduciary duty to him, to institute an action pursuant to Civ.R. 23.1, then any recovery would accrue to the corporation and remain under the control of the very parties who are defendants in the litigation. Thus, a derivative remedy is not an effective remedy because the wrongdoers would be the principal beneficiaries of the recovery. See, generally , 2 [O'Neal & Thompson] O'Neal's Close Corporations [ (3 Ed.1987) ] 120-123, Section 8.11.
{¶ 29} Under the authority of Crosby , Merletti contends that, as a minority shareholder of ETG, a closely held corporation, he properly brought his breach of *340 fiduciary duty and fraud claims as direct claims against the defendants.
Trial Court's Ruling
{¶ 30} The trial court recognized Crosby and its holding, stating that "Ohio law allows for a minority shareholder like [Merletti] to file a direct action lawsuit at the outset for claims asserting individual harm against majority shareholders of a closely held corporation * * *."
{¶ 31} But the court found that "even in situations in which a direct action by a minority shareholder against majority shareholders is appropriate under state law, the bankruptcy proceeding of the debtor corporation takes precedence in rendering the minority shareholder's direct action inappropriate if the debtor corporation could have also brought forth an action for the same state claims at the time of its bankruptcy filing."
{¶ 32} The trial court went on to find that Merletti's "state claims for breach of fiduciary duty and fraud against defendant Samide and defendant Katigbak could have been brought by debtor ETG at the commencement of ETG's bankruptcy proceeding, and thus those claims have exclusively become the property of ETG's bankruptcy estate and cannot be maintained by [Merletti] as a creditor at this stage in the litigation." In reaching its conclusion, the trial court relied on Honigman v. Comerica Bank (In re Van Dresser Corp.) , 128 F.3d 945 (6th Cir.1997), Boedeker v. Rogers , 140 Ohio App.3d 11, 746 N.E.2d 625 (8th Dist.2000), and Stanley v. Trinchard , 579 F.3d 515 (5th Cir.2009).
Honigman v. Comerica Bank (In re Van Dresser Corp.) , 128 F.3d 945 (6th Cir.1997)
{¶ 33} In In re Van Dresser , the plaintiff, Daniel Honigman ("Honigman"), was a shareholder of the Van Dresser Corporation. Van Dresser owned two subsidiaries: Renaissance Manufacturing Company ("Renaissance") and Van Dresser Corporation/Westland ("Westland"). One of the defendants, Grant Friley ("Friley"), was the president of Renaissance and the manufacturing manager of Westland. Friley drained approximately $2.7 million from Renaissance and Westland, causing both subsidiaries and the parent company, Van Dresser, to declare bankruptcy. In state court, Honigman sued Friley, Comerica Bank, which was the bank Honigman dealt with, and an assistant branch manager of the bank, alleging that the defendants caused him to lose approximately $1.1 million.
{¶ 34} Honigman maintained that he was not suing as a shareholder who had been injured by the loss of his stock value; rather, he contended that he had a direct relationship with the bank as a longtime borrower, which gave rise to special duties owed to him personally. Specifically, according to Honigman, Van Dresser obtained a $225,000 loan from the bank because of his relationship with the bank and his cosigning on the loan, and he guaranteed another $900,000 in loans from the bank to Van Dresser. Thus, Honigman maintained that when the company defaulted on the loans, he was forced to repay them and, therefore, he suffered an injury separate and distinct from the injuries that Van Dresser, Renaissance, and Westland suffered.
{¶ 35} Renaissance and Westland recovered a portion of the $2.7 million from the bank. The bankruptcy trustees for the companies notified all creditors, including Honigman, of a proposed settlement with the bank. Honigman did not object, and the bankruptcy court approved the settlement.
{¶ 36} The district court found that Honigman's claims were derivative and therefore were the exclusive property of *341 the debtors' estates. Honigman appealed, contending that state law (Michigan) allowed him to recover personally from Friley, the bank, and the bank's assistant manager and to recover from the defendants through the bankruptcy proceedings. The defendants, on the other hand, contended that recovery was solely through the bankruptcy proceedings, and the Sixth Circuit Court of Appeals agreed.[3] The court reasoned as follows:
Property of a debtor's estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The commencement of the case" is the moment the debtor files for bankruptcy. Koch Refinancing. [Refining] v. Farmers Union Cent. Exchange, Inc. , 831 F.2d 1339, 1343 (7th Cir. 1987). And it is "well established that the 'interests of the debtor in property' include 'causes of action.' " Bauer v. Commerce Union Bank , 859 F.2d 438, 441 (6th Cir.1988). A debtor's appointed trustee has the exclusive right to assert the debtor's claim. Schertz-Cibolo-Universal City, Indep. School Dist. v. Wright (In re Educators Group Health Trust ), 25 F.3d 1281, 1284 (5th Cir.1994). "If, on the other hand, a cause of action belongs solely to the estate's creditors, then the trustee has no standing to bring the cause of action." Id.
Whether a creditor has sole right to a cause of action is determined in accordance with state law. Oakland Gin Co. v. Marlow (In re The Julien Co. ), 44 F.3d 426, 429 (6th Cir.1995). However, if the debtor could have raised a state claim at the commencement of the bankruptcy case, then that claim is the exclusive property of the bankruptcy estate and cannot be asserted by a creditor. In re Educators Group Health Trust , 25 F.3d at 1284. "Conversely, if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate." Id. Thus, if Honigman's state claims could have been brought by Van Dresser or its subsidiaries on [the date bankruptcy was filed], then the plaintiff is barred from pursing them now.
In re Van Dresser, 128 F.3d at 947.
Boedeker v. Rogers , 140 Ohio App.3d 11, 746 N.E.2d 625 (8th Dist.2000)
{¶ 37} The issue in Boedeker was whether the superintendent of insurance of the Ohio Department of Insurance, in his capacity as the liquidator of the P.I.E. Mutual Insurance Company, was authorized to be substituted as the plaintiff in the case, in which the shareholders of the insurer pleaded derivative claims on behalf of the corporation as well as individual claims on behalf of the shareholders. The shareholders opposed the substitution, and the trial court agreed with them and denied the superintendent/liquidator's request to be substituted as the plaintiff, but allowed him to intervene in the action. The trial court also dismissed the plaintiffs' individual claims and left only the derivative claims for disposition.
{¶ 38} On appeal, the superintendent/liquidator challenged the denial of his motion seeking substitution; the plaintiffs also filed an appeal challenging the dismissal of their individual claims. This court considered the superintendent/liquidator's request to be substituted as to each set of the plaintiffs' claims: (1) the derivative claims and (2) the individual claims.
*342 {¶ 39} The plaintiffs' derivative claims included counts for unauthorized payments, excessive compensation, breach of fiduciary duties, and professional malpractice. In determining whether the superintendent/liquidator should have had control of the plaintiffs' derivative claims, this court considered the "nature and extent of authority granted to a liquidator under Ohio law." Boedeker at 21, 746 N.E.2d 625. This court noted that the "extensive authority conferred upon a statutory liquidator is intended to prevent waste of the insurer's assets." Id. , citing 1 Couch on Insurance 3d (1997) 5-65, Section 5:37.
{¶ 40} The Boedeker court concluded that Ohio law "clearly authorize[s] a liquidator to take over, without interference, any claims, suits, or rights of action possessed and asserted directly by the insurer" and there was "no reason why there should be a different result for claims, suits, or rights of action asserted derivatively on behalf of the insurer by its shareholders." Id. , 140 Ohio App.3d at 23-24, 746 N.E.2d 625. Thus, this court held that, although the plaintiffs had the right to prosecute their claims prior to liquidation, the "liquidation order effectively transferred that interest to the liquidator." Id. at 26, 746 N.E.2d 625.
{¶ 41} In regard to the plaintiffs' individual or personal claims, which included counts for conversion, tortious interference with contractual relationships and violation of Ohio insurance laws, this court found that a "shareholder's direct claim against an officer or director * * * is personal to the shareholder and is not on behalf of the insurer. Consequently, [Ohio law] does not authorize the liquidator to prosecute the shareholder's direct claims." Id. at 30, 746 N.E.2d 625. This court recognized that " 'some actions for fraud are by their nature personal to each creditor, or each stockholder, or each policyholder, and the receiver may not then maintain a suit in his representative capacity for their joint benefit.' " Id. at 28, 746 N.E.2d 625, quoting Cotten v. Republic Natl. Bank of Dallas , 395 S.W.2d 930, 941 (Tex.Civ.App.1965).
Stanley v. Trinchard , 579 F.3d 515 (5th Cir.2009)
{¶ 42} In Stanley , the 5th Circuit Court of Appeals considered which statute of limitations controlled a bankrupt estate's legal malpractice claim: the state of Louisiana or the United States Bankruptcy Code. The court held that the bankruptcy code took precedence, stating that although it was "sympathetic to the importance of preserving state law property rights intact in bankruptcy," "[t]he subject of bankruptcy falls within the express constitutional powers of Congress, and bankruptcy law therefore takes precedence over state laws under the Supremacy Clause." Id. at 519.
Parties' Positions
{¶ 43} The defendants contend that In re Van Dresser , 128 F.3d 945, is on point with this case, while Merletti contends that it is inapplicable because it was decided under Michigan law and because the debtor was not a close corporation. Merletti further claims that Boedeker , 140 Ohio App.3d 11, 746 N.E.2d 625, is inapplicable here because the issue in that case is the real party in interest in an insurance liquidation proceeding. In addition to relying on Crosby , 47 Ohio St.3d 105, 548 N.E.2d 217, Merletti cites Yackel v. Kay , 95 Ohio App.3d 472, 642 N.E.2d 1107 (8th Dist.1994), and Edelman v. JELBS , 10th Dist. Franklin, 2015-Ohio-5542, 57 N.E.3d 246.
Yackel v. Kay , 95 Ohio App.3d 472, 642 N.E.2d 1107 (8th Dist.1994)
{¶ 44} In Yackel , the plaintiff brought an action against a closely held manufacturing company and the company's president; the plaintiff was a minority shareholder and former vice president of sales.
*343 {¶ 45} As to the claims against the president, the plaintiff alleged that the president, the majority shareholder, breached his fiduciary duty to the company by using his position as majority shareholder to "derive personal financial benefit from [the company] thereby depriving minority shareholders of their just share of the corporation's profits." Id. at 475, 642 N.E.2d 1107. The alleged personal benefits included excessive salary and bonuses; medical insurance for the president, his former wife and an unidentified individual; payment on personal credit card bills; personal travel expenses; and real estate taxes on the president's personal property. The plaintiff also alleged that the president conspired with the remaining shareholders and orchestrated the plaintiff's ouster as vice president of sales.
{¶ 46} One of the issues on appeal was whether the plaintiff's direct action against the president was proper, or whether it should have been brought as a shareholder derivative action under Civ.R. 23.1. Citing Crosby , 47 Ohio St.3d 105, 548 N.E.2d 217, this court held that the plaintiff properly brought his direct action against the president.
Edelman v. Jelbs , 10th Dist. Franklin , 2015 - Ohio - 5542 , 57 N.E.3d 246
{¶ 47} Edelman involved a situation where the plaintiff was a minority shareholder and former employee of a closely held corporation, and alleged that the other shareholders breached their fiduciary duties to plaintiff and the company relative to share dividend distributions. The plaintiff filed an action individually and derivatively. In resolving another issue - i.e., the burden regarding the reasonableness of the defendants' compensation - the court, citing Crosby and Yackel , 95 Ohio App.3d 472, 642 N.E.2d 1107, noted that Ohio law allows direct actions by a minority shareholder in a closely held corporation.
Discussion
{¶ 48} Review of the above-cited cases demonstrates that a direct action by a minority shareholder in a closely-held corporation is permissible under Ohio law. Thus, to the extent that Merletti's action was a direct action, it would generally be permissible under Ohio law. But that does not end our inquiry because there is a complicating factor here: the company's bankruptcy. The cases Merletti relies on - Crosby , Yackel , and Edelman - did not involve bankruptcy. Here, as mentioned, ETG filed for bankruptcy in June 2015, while this case was still pending, and a trustee was appointed. We now review some further facts relative to the bankruptcy proceeding in this case.
{¶ 49} In addition to Merletti's claims against ETG, the company was also subject to claims made by others. Specifically, former board member and shareholder Jacquelyn Huron ("Huron") and former employee and shareholder Stephen Heestand filed an action against ETG, Samide, and Katigbak ("the Huron case"). The claims of all these plaintiffs - Merletti , Huron , and Stephen Heestand - were subject to the bankruptcy proceedings .
{¶ 50} In regard to Merletti, the record demonstrates that in November 2015, by and through the same counsel who represented him in this action, Merletti filed a notice of claim in the bankruptcy case, seeking $1.6 million for the "repurchase of [his] shares of stock per [the] shareholder agreement"; Merletti also sought $1.6 million in this case.[4]
*344 {¶ 51} During the course of the bankruptcy proceedings, the parties in the Huron case and the bankruptcy trustee entered into a settlement agreement. The settlement included a release of Samide and Katigbak. The settlement was approved by the bankruptcy court after finding that there were no objections to it and that it was "in the best interests of this estate and its creditors."
{¶ 52} In November 2016, the bankruptcy trustee and Merletti entered into a settlement agreement. Under the agreement, ETG would dismiss its counterclaims against Merletti set forth in this action in exchange for Merletti dismissing his claims against the company in this action and subordinating his $1.6. million claim. Merletti also agreed not to object to the settlement in the Huron case . The trustee stated the following in regard to the settlement:
Having given serious consideration to the litigation alternative, the trustee believes that the compromise as proposed is fair and reasonable in light of the fact that the State Court Action [this case] has been aggressively prosecuted and defended without any meaningful prospect of settlement until now, the costs and expenses of continuing the litigation, the risks inherent in such litigation and the delay in expeditiously administering the estate as the result of continued litigation.
{¶ 53} As stated, the settlement in the Huron case included a release of Samide and Katigbak; Merletti agreed to not object to that release. Merletti's claims were therefore settled in the bankruptcy proceeding, and review of documents submitted in this case from the bankruptcy proceeding demonstrate that that was the intent of the parties: to completely settle the matter.
{¶ 54} Therefore, Merletti's attempt to continue to litigate his claims in this case is an attempt to obtain a double recovery. It is a well-settled rule of law that the "measure of damages is that which will compensate and make the plaintiff whole." Pryor v. Webber , 23 Ohio St.2d 104, 263 N.E.2d 235 (1970), paragraph one of the syllabus. Thus, the law of damages is generally intended to preclude double recovery for an injury.
{¶ 55} Moreover, the doctrine of res judicata has been applied in the bankruptcy context. See Badovick v. Greenspan , 8th Dist. Cuyahoga No. 96097, 2011-Ohio-3262, 2011 WL 2568218, ¶¶ 13, 16-17 (" 'Numerous courts have held that in context of bankruptcy matters, not only formally named parties, but all participants in the bankruptcy proceedings, are barred by res judicata from asserting matters they could have raised in the bankruptcy proceedings.' ") Id. at ¶ 16, quoting Federated Mgt. Co. v. Latham & Watkins , 138 Ohio App.3d 815, 823, 742 N.E.2d 684 (10th Dist.2000).
{¶ 56} This case is, as the trial court found, most in line with In re Van Dresser , 128 F.3d 945 (6th Cir.1997). We recognize, as Merletti points out, that the company at issue in In re Van Dresser , was not a closely held corporation. Nonetheless, we cannot ignore the bankruptcy proceeding.
{¶ 57} A matter is within the jurisdiction of a bankruptcy proceeding if it is simply "related to" the bankruptcy. Intl. Total Servs., Inc. v. Garlitz , 8th Dist. Cuyahoga No. 90441, 2008-Ohio-3680, 2008 WL 2834174, ¶ 11, citing Peabody Landscape Constr., Inc. v. Schottenstein , 371 B.R. 276 (S.D. Ohio 2007). The Sixth Circuit Court of Appeals has determined that a claim is *345 "related to" a bankruptcy proceeding if the result of the matter " 'could alter the debtor's rights, liabilities, options, or freedom of action and which in any way impacts upon the handling and administration of the bankrupt estate.' " Browning v. Levy , 283 F.3d 761, 773 (6th Cir.2002), quoting Lindsey v. O'Brien, Tanski, Tanzer & Young Health Care Providers (In re Dow Corning Corp.) , 86 F.3d 482, 489 (6th Cir. 1996).
{¶ 58} The record here demonstrates that Merletti participated and reached a settlement in the bankruptcy proceeding. The record further indicates that it was the intent of the parties that settlement of Merletti's bankruptcy claim was for complete settlement of the entire matter. The fact that ETG was a closely-held corporation does not change the outcome for the purpose of resolving this case.
{¶ 59} Further, although Boedeker did not involve bankruptcy, it addressed more than the issue of a real party in interest, as previously discussed. And the ruling that although a plaintiff may have had a right to prosecute his or her claim prior to liquidation, but the interest transfers to a liquidator upon a liquidation order, is persuasive, analogous authority for us in resolving this matter involving bankruptcy.
{¶ 60} Therefore, for the reasons discussed above, we find that the trial court properly granted summary judgment in favor of Samide and Katigbak. Merletti's sole assignment of error is overruled.
{¶ 61} Judgment affirmed.
TIM McCORMACK, P.J., and KATHLEEN ANN KEOUGH, J., CONCUR

"Book value" was to be determined by ETG or its accountants.

"Close corporations bear a striking resemblance to a partnership. In essence, the ownership of a close corporation is limited to a small number of people who are dependent on each other for the enterprise to succeed. Just like a partnership, the relationship between the shareholders must be one of trust, confidence and loyalty if the close corporation is to thrive." Crosby , 47 Ohio St.3d at 108-109, 548 N.E.2d 217. Given this nature, the court stated that the close corporation structure "also gives majority or controlling shareholders opportunities to oppress minority shareholders." Id. at 109, 548 N.E.2d 217.

The court found, however, that Honigman's claims for costs and attorney fees arose solely under state law and did not involve the debtors' estate.

The bankruptcy trustee found that the Merletti's claim in the bankruptcy proceeding was "predicated upon the claims asserted [in this case]," which the trustee found "consumed a substantial amount of time and resources of all the parties involved over the past four (4) years."